# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: December 27, 2024

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| EDWIN WEISS, | * | No. 19-1786V |
| | * | |
| Petitioner, | * | Special Master Young |
| | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | * | |

*Michael Andrew London*, Douglas & London, P.C., New York, NY, for Petitioner.
*Ryan Pohlman Miller*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION ON SIX-MONTH SEVERITY REQUIREMENT[1]

On November 20, 2019, Edwin Weiss ("Petitioner") filed a petition for compensation in the National Vaccine Injury Compensation Program ("the Program").[2] Pet., ECF No. 1. Petitioner alleged that the influenza ("flu") vaccine he received on November 29, 2016, caused him to suffer a Table injury of Guillain-Barré syndrome ("GBS"). *Id.* at 1.

After carefully analyzing and weighing all the evidence presented in this case in accordance with the applicable legal standards,[3] I find that Petitioner has failed to provide

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the Decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding

preponderant evidence that he suffered a vaccine-related injury for more than six months. Accordingly, the petition must be dismissed.

## I. Relevant Procedural History

Petitioner filed his petition on November 20, 2019. Pet. This case was assigned to the special processing unit ("SPU") on May 19, 2020. The parties engaged in settlement discussions beginning in February of 2021; however, they reported an impasse in October of 2021 and requested a deadline for Respondent's Rule 4(c) report. ECF No. 44. Respondent filed his Rule 4(c) report, opposing compensation, on December 4, 2021. Resp't's Rept., ECF No. 45. Specifically, Respondent argued that: (1) Petitioner has failed to demonstrate that he suffered the residual effects of GBS for more than six months after the administration of his flu vaccine; (2) Petitioner has not established a Table injury; and (3) Petitioner has not established causation-in-fact claim.[4] *Id.*

The case was transferred out of SPU and reassigned to me in February of 2022. Petitioner's claim was transferred out of SPU because Respondent argued Petitioner failed to demonstrate that he suffered the residual effects of GBS for more than six months after the administration of the vaccine, Petitioner had not established a Table injury, and Petitioner had not established actual causation. ECF No. 46 at 1–2. In the transfer order, the chief special master noted that Petitioner's "medical records fail to reflect that [he] suffered from bilateral ophthalmoparesis, as required to establish a Table injury[]" for the Miller Fisher variant of GBS. *Id.* at 1. The chief special master also noted that "Petitioner may [] need a medical expert to demonstrate that his alleged continued symptoms are the residual effects of his GBS." *Id.* at 2.

On August 17, 2022, Petitioner filed an expert report from Dr. Salvatore Q. Napoli. Pet'r's Ex. 15. On November 30, 2022, Respondent filed an expert report from Dr. Mark B. Bromberg. Resp't's Ex. A. Petitioner filed a supplemental expert report from Dr. Napoli on April 17, 2023, and Respondent filed a supplemental expert report from Dr. Bromberg on June 28, 2023. Pet'r's Ex. 27; Resp't's Ex. C.

The medical records up to this point indicate that Petitioner did not report or exhibit GBS symptoms between December of 2016 and October of 2018. Accordingly, on September 27, 2023, I ordered Petitioner to file objective evidence that his injury or the residual effects of his injury lasted for at least six months (demonstrating that Petitioner continued experiencing symptoms of his alleged GBS in the months between December of 2016 and June of 2017). ECF No. 63. Petitioner was given the opportunity to provide this evidence in the form of witness affidavits, medical records, or other evidence.

On April 22, 2024, Petitioner filed physical therapy records from March 25, 2024, to support the contention that the residual effects of his injury lasted for at least six months. Pet'r's Ex. 28. Respondent filed a status report, indicating Petitioner's additional medical records did not contain evidence that is helpful to Petitioner in satisfying the Vaccine Act's severity

---

certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

[4] Petitioner did not assert a causation-in-fact claim in his petition.

requirement. ECF No. 70. Accordingly, I ordered the parties to brief the issue regarding the six-month severity requirement. ECF No. 71. On August 30, 2024, Petitioner filed his brief, an affidavit, and an additional handwritten medical record. Pet'r's Br., ECF No. 74; Pet'r's Exs. 29–30. On October 14, 2024, Respondent filed a responsive brief. Resp't's Response, ECF No. 75. Petitioner filed a reply brief on October 29, 2024. Pet'r's Reply, ECF No. 76. This matter is now ripe for adjudication.

## II.    Factual Background

### a.    Relevant Medical Records[5]

Prior to vaccination, Petitioner had a past medical history of hypertension. *See* Pet'r's Ex. 8 at 4. Petitioner's medical records show that prior to the onset of his GBS, he was independent with all ambulation and activities of daily living, was active in his community, and exercised regularly including jogging. *See* Pet'r's Ex. 13 at 21. Petitioner was 73 years old and a practicing cardiologist at NYU Langone Health System when he received the subject flu vaccination on November 29, 2016. Pet'r's Ex. 1; Pet'r's Ex. 2 at 21.

Eleven days following his flu vaccination, while out to dinner on December 10, 2016, Petitioner experienced a fainting spell, described as him "slumping" at the table, becoming pale, and "black[ing] out," which also involved a headache and dizziness. Pet'r's Ex. 8 at 4–5. He presented to the emergency department ("ED") at White Plains Hospital with the chief complaints of syncope and collapsing. *Id.* at 4. He was discharged home the next day in stable condition. *Id.* at 5.

On December 19, 2016, Petitioner visited neurologist, Dr. Andreas N. Neophytides, for dizziness and headaches. Pet'r's Ex. 4 at 1–5. Upon physical examination of the cranial nerve, Dr. Neophytides noted "left ptosis[6] and exotropia[7] without diplopia."[8] *Id.* at 4. Regarding sensation, Petitioner was noted to have "vibration diminished bilaterally at the toes. Pinprick slightly diminished at the toes bilaterally." *Id.* As to the decreased sensation in his toes, at the time, Dr. Neophytides noted it to be "mild sensory polyneuropathy, possibly age-related." *Id.* at 5.

Four days later, on December 22, 2016, Petitioner visited his ophthalmologist, Dr. Munro Levitsky. Pet'r's Ex. 14 at 4.  Dr. Levitsky's notes indicate a diagnosis of left early facial nerve palsy as well as a proposed diagnosis of GBS. *Id.* Later that day, Petitioner returned to Dr. Neophytides who noted that Petitioner "had shown earlier mild vibratory loss in his toes" and

---

[5] Only the medical records relevant to the issue subject to this Decision are discussed.
[6] Ptosis refers to drooping of the upper eyelid. *Ptosis*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=42014 (last visited Dec. 26, 2024).
[7] Exotropia is "strabismus in which there is permanent deviation of the visual axis of one eye away from that of the other." *Exotropia*, DORLAND'S MED. DICTIONARY ONLINE,
https://www.dorlandsonline.com/dorland/definition?id=17892 (last visited Dec. 26, 2024).
[8] Diplopia refers to double vision. *Diplopia*, DORLAND'S MED. DICTIONARY ONLINE,
https://www.dorlandsonline.com/dorland/definition?id=14354 (last visited Dec. 26, 2024).

now "complained of being 'out of balance' and he could not tandem well, teetering as he tried it. He had a few missing reflexes." Pet'r's Ex. 2 at 15.

That same day, on December 22, 2016, Petitioner was admitted to NYU Langone with impaired left eye gaze in all directions, left-sided facial weakness, left-sided ptosis, and headaches for a few days. *Id.* at 9–14. Petitioner had reduced reflexes and decreased vibratory sensation in his lower extremities, but normal coordination and muscle strength. *Id.* at 12–13. Other than slight ataxia when tandem walking, his gait and mobility were not impaired. *Id.* at 13. He had normal brain magnetic resonance imaging ("MRI") and a normal blood test. *Id.* at 14. A diagnostic lumbar puncture was attempted for a suspected diagnosis of the Miller Fisher variant of GBS; the sample was bloody and difficult to interpret but did show an elevated protein level. *Id.* at 8. An electromyography ("EMG") showed "findings consistent with [acute inflammatory demyelinating polyneuropathy ("AIDP")]." *Id.* at 5. A ganglioside antibody test showed an elevated level of asialo-GM1 antibodies. *Id.* at 63. However, his other antibody levels were normal. *Id.* Physicians tentatively diagnosed Petitioner with the Miller Fisher variant of GBS and began intravenous immune globulin ("IVIG") therapy. *Id.* at 8, 15.

During his hospital stay, Petitioner complained of headaches with mild nausea and facial weakness. *Id.* at 32. He remained independent with ambulation and activities of daily living throughout his stay and was noted to be frequently walking around the hospital unit. *Id.* at 15, 23, 31. Petitioner was discharged on December 26, 2016, after five days of IVIG treatment, and his final diagnoses included GBS and trigeminal neuropathy. *Id.* at 3–6. By the time of discharge, he had mild improvement in his left-sided facial droop; normal strength, gait, coordination, and sensation; and continued to have some decreased reflexes in his upper and lower extremities. *Id.* at 4-5.

After his discharge and through 2017, Petitioner did not seek any care for any ongoing GBS sequelae. *See* Pet'r's Ex. 11 at 17; Pet'r's Ex. 14 at 4. The only medical record mentioning Petitioner's alleged GBS from 2017 was a note from his visit with his ophthalmologist. Pet'r's Ex. 14 at 4. The note, dated April 2, 2017, provided that Petitioner had been diagnosed with GBS but was, "back to normal." *Id.* at 4.

The records of Petitioner's medical care in 2018 indicate that he had recovered from any alleged GBS-related symptoms. *See* Pet'r's Ex. 9 at 4–6 (January 3, 2018 visit with his internist, in anticipation of a cataract surgery, during which it was noted that Petitioner's hypertension was well-controlled, he was performing aerobic exercise daily with no chest pain or shortness of breath, that he denied any dizziness, muscle weakness, or tremors, and that his examination was normal, with no focal neurologic deficits); Pet'r's Ex. 2 at 229–36 (March 4, 2018 ED visit for dizziness and palpitations associated with an irregularly-fast heart rate, during which Petitioner had a normal neurological examination and did not mention any allegedly GBS-related symptoms); Pet'r's Ex. 2 at 301 (July 23, 2018 visit to the electrophysiology department at NYU for outpatient cardiac care, to follow-up on the episode of heart arrhythmia that precipitated Petitioner's ED visit in March 2018, during which a nurse noted that Petitioner had a history of GBS but had a "full recovery" and his examination showed no focal neurologic deficits).

4

On October 24, 2018, 22 months after vaccination, Petitioner saw infectious disease specialist Dr. Eddie Louie who noted Petitioner's condition was "[i]mproved but still with balance issues." Pet'r's Ex. 3 at 1–3. Petitioner's neurologic examination was normal. *Id.* at 3. Given Petitioner's history of GBS, Dr. Louie advised Petitioner to forego further vaccination. *Id.*

On November 14, 2018, nearly two years after his hospitalization and IVIG treatment, Petitioner returned to his neurologist, Dr. Neophytides. Pet'r's Ex. 4 at 24. Petitioner complained of poor balance. *Id.* By that point, he was 75 years old. *See id.* His balance difficulties were described as "able to walk well but when he would find himself in a narrow corridor such as a theater[,] he would stumble and lose his balance." *Id.* Petitioner noted that he had recently undergone cataract surgery in both eyes, and his vision had substantially improved. *Id.* His neurological examination was normal, apart from Petitioner's "slightly poor balance," including some impairment with tandem walking and balancing on one foot. *Id.* at 25. Dr. Neophytides diagnosed Petitioner with "mild gait ataxia, most likely due to cerebellar dysfunction, perhaps related to the history of LGBS [Landry Guillain-Barré syndrome]." *Id.* at 27. He ordered an MRI and a videonystagmography ("VNG") study. *Id.* at 23, 27; *see also id.* at 31 (noting on November 6, 2019 that a brain MRI "a year ago" was normal and "[o]ther possibilities such as [benign paroxysmal positional vertigo] and [v]estibular hypofunction ha[d] been ruled out with a VNG").

Petitioner next sought care one year later, on November 5, 2019, when he presented to his internist for an annual wellness examination. Pet'r's Ex. 9 at 10. Petitioner did not report any weakness or fatigue, and stated he had "good exercise tolerance" and the ability to perform his usual activities. *Id.* at 11. His physical examination was normal, with no neurological or musculoskeletal abnormalities. *Id.* at 12. Petitioner's bloodwork was also normal, apart from a high vitamin B12 level. *Id.* at 23–27. Petitioner returned to his neurologist, Dr. Neophytides, on November 6, 2019, and his assessment was "mild gait ataxia, most likely due to cerebellar dysfunction perhaps related to the history of LGBS but it could still be within normal limits for age." Pet'r's Ex. 4 at 28–40. He noted "[t]here ha[d] been no worsening since last year, which [was] reassuring." *Id.* at 35. Dr. Neophytides advised Petitioner to follow up again in one year. *Id.*

On March 25, 2024, Petitioner saw Jie Lin, a physical therapist ("PT") at Rusk Rehabilitation at NYU Langone Ambulatory Care Center. *See generally* Pet'r's Ex. 28. During this visit, Petitioner reported unsteadiness on his feet. *Id.* at 3. He was 80 years old at the time, and PT Lin recorded Petitioner's gait issues impacted some leisure activities. *Id.* at 3, 6 ("The patient's current condition for which they are seeking care is affecting their ability to participate in the following life situations: hobbies/leisure activities"). PT Lin neither offered an independent assessment of the cause of Petitioner's unsteadiness, nor stated it was a residual symptom of Petitioner's alleged vaccine injury; rather, PT Lin simply recorded Petitioner's retrospective reporting of events, including being admitted to the hospital for GBS after the flu shot, "think[ing] his imbalance [was] slightly worsening over the years, and fe[eling] imbalance when walking down steps and curbs." *Id.* at 3.

5

### b. Petitioner's Affidavit

Petitioner executed an affidavit on August 30, 2024. Pet'r's Ex. 29. Prior to the vaccination at issue, Petitioner reported he was a "healthy individual." *Id.* at ¶ 2. He did not suffer from a neuroimmunologic condition or any balance issues prior to receiving the vaccine. *Id.* Rather, he averred he "exercised regularly and would go jogging without incident." *Id.*

Petitioner described his GBS onset in December 2016, including passing out at dinner and being admitted to the hospital. *Id.* at ¶ 4. At the time of his discharge, his condition had greatly improved "but the GBS had not completely resolved." *Id.* at ¶ 5. Petitioner also stated that he still had facial issues. *Id.* "As to [his] walking and balance, that had seemed to improve and [he] believed at the time of discharge that it had been resolved. However, that was not the case." *Id.* Petitioner's balance issues started shortly after discharge and "became a real issue" for him. *Id.* at ¶ 6. He recalled being unsteady, feeling imbalanced, and almost falling. *Id.* Petitioner reported that he "did not go see a doctor for it immediately because [he] knew it was a residual from [his] GBS and that there was likely nothing they could do about it, and [he] would have to deal with it." *Id.*

After dealing with balance issues for two years, he felt they were getting worse and decided to see his neurologist Dr. Neophytides. *Id.* at ¶ 7. Dr. Neophytides told him to follow up in a year which Petitioner stated that he did. *Id.* Petitioner also started physical therapy. *Id.* at ¶ 8.

Petitioner averred that his counsel informed him of medical records from 2017 and 2018 that indicated Petitioner was not experiencing any residuals of his GBS. *Id.* at ¶ 9. As to the April 2017 visit with his ophthalmologist Dr. Levitsky, Petitioner stated he did not report that his GBS was back to normal, because it was not—he was still experiencing balance issues. *Id.* at ¶ 11. He explained that Dr. Levitsky was his doctor related to his congenital cataracts and that is what that 2017 visit was for. *Id.* Thus, Petitioner did not discuss his GBS with Dr. Levitsky then. *Id.* At that time, Petitioner was still experiencing balance issues, and he reported those issues to his neurologist Dr. Neophytides.[9] *Id.*

As to the July 2018 ED visit for atrial fibrillation, Petitioner averred he does not know why it was noted that he was "fully recovered" from his GBS. *Id.* at ¶ 10. Petitioner did "not know where that information would have been obtained[,] and [he] d[id] not recall reporting that to any healthcare provider at all or any particular provider at that visit." *Id.* He stated he "would especially not have reported to anyone that [he] was fully recovered[,] because [he] was still experiencing balance issues." *Id.* While Petitioner was still experiencing balance issues at that time, that hospital visit was related to atrial fibrillation, and Petitioner was focused on getting that resolved. *Id.* Instead, Petitioner reported his balance complaints to his neurologist.[10] *Id.*

---

[9] There is no evidence Petitioner saw Dr. Neophytides in 2017.
[10] Petitioner did not return to his neurologist until November 2018.

6

### c. Expert Reports[11]

#### i. Petitioner's Expert, Salvatore Q. Napoli

Dr. Napoli is a board-certified neurologist. Pet'r's Ex. 15 at 2. He provides clinical care for patients with multiple sclerosis ("MS") and other neuroimmunologic conditions. *Id.* In the past five years, Dr. Napoli has treated approximately five cases of GBS. *Id.* While Dr. Napoli conducts research and has publications, he has never published on GBS or the residuals of GBS. *Id.*

Dr. Napoli asserted that Petitioner was appropriately diagnosed with the Miller Fisher variant of GBS. Pet'r's Ex. 15 at 5–6. The classical features of the Miller Fisher variant include ophthalmoplegia, ataxia, and areflexia. *Id.* at 5. Dr. Napoli defined ataxia as "difficulties with walking and balance and discoordination and clumsiness of movements." Pet'r's Ex 27 at 2.

Dr. Napoli wrote "there have been studies showing that residual deficits can undoubtedly occur and remain more than [six] months." Pet'r's Ex. 15 at 6. He did not state what these residual deficits are, and Petitioner did not file these studies. Dr. Napoli also stated the National Institute of Neurological Disorders and Stroke "notes that while the prognosis for most individuals with Miller Fisher syndrome is good, some individuals are left with residual deficits." *Id.*

Dr. Napoli wrote that the records from Dr. Louie and Dr. Neophytides support the contention that Petitioner's GBS lasted for more than six months. *Id.* at 8; Pet'r's Ex. 27 at 3. Petitioner saw both doctors in Fall of 2018, and it was reported that Petitioner's GBS had improved but he still had balance issues and "gait ataxia." Pet'r's Ex. 15 at 8 (citing Pet'r's Ex. 3 at 1, 3; Pet'r's Ex. 4 at 15–19). Petitioner saw Dr. Neophytides again in Fall of 2019 where it was noted that Petitioner had recovered well from his GBS but was "left with minimal impairment in his balance." *Id.* (citing Pet'r's Ex. 4 at 28–32).

He noted that "[a]taxia is a known residual [effect] of GBS that can linger even if the individual has recovered for the most part." *Id.* at 8. Dr. Napoli opined that Petitioner "for the most part recovered from his GBS, but [was] still experiencing ataxia as of November 2019" which supports the residual effects of GBS. *Id.* at 7 (citing Pet'r's Ex. 4 at 28–32).

#### ii. Respondent's Expert, Mark B. Bromberg

Dr. Bromberg is a board-certified neurologist. Resp't's Ex. A at 1. In his clinical role, Dr. Bromberg frequently diagnoses demyelinating neuropathies such as GBS, including the Miller Fisher variant. *Id.* Dr. Bromberg has published articles on the diagnosis of peripheral neuropathies. *Id.*

Dr. Bromberg disagreed with Dr. Napoli that Petitioner's "clinical history and examination include[d] features of GBS, and that he has the triad of the [Miller] Fisher syndrome." *Id.* at 6.

---

[11] Only the opinions relevant to the six-month severity issue are discussed here.

As to the six-month severity, Dr. Bromberg merely opined that because Petitioner did not have GBS, he could not have residuals of it, specifically ataxia, for more than six months. *See id.* at 8. Discussing Petitioner's November 6, 2019 medical records, Dr. Bromberg noted that Dr. Neophytides wrote "[i]mpaired tandem. Has difficulty standing on one leg. Has difficulty standing with [one] foot in front of the other." *Id.* at 6 (quoting Pet'r's Ex. 4 at 31). Dr. Bromberg opined that "[t]hese are subjective findings and do not constitute clinical ataxia, which is manifested by difficulty with walking (wide based gait, staggering positive Romberg) and clumsy arm and leg movements." *Id.* He further noted that Petitioner was 73 years old when he received the vaccination at issue, and "it is not unreasonable for there to be difficulty with tandem gait at that age[.]" *Id.*

### III.   Parties' Contentions

Petitioner argues he meets the six-month severity requirement because he experienced residual effects of his GBS, balance issues, for more than six months and continues to experience them to this day. Pet'r's Br. at 14. For support, he cites the 2018, 2019, and 2024 medical records.

Respondent argues there is insufficient evidence to prove that Petitioner's alleged GBS lasted six months. Resp't's Response at 1, 11. Respondent notes that no treater recorded ongoing GBS symptoms from December of 2016 to October of 2018 and this 22-month gap in care or treatment undercuts the claim that Petitioner's condition was an ongoing residual effect of GBS rather than a natural result of aging. *Id.* at 12.

### IV.   Discussion

#### a.  Standards for Adjudication

Petitioners not asserting a vaccine-related death or other injury requiring a surgical intervention and inpatient care must demonstrate that they suffered the residual effects or complications from their vaccine-related injury for more than six months. Section 11(c)(1)(D); *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011).

It is the petitioner's burden to prove his case, including the six-month severity requirement, by a preponderance of the evidence. *Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65–66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994). A petitioner cannot establish the length or ongoing nature of an injury solely through his or her own statements, but rather is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months." *Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995), *aff'd*, 93 F.3d (Fed. Cir. 1996).

While even mild symptoms that do not require intensive medical care may satisfy the severity requirement, ongoing medical treatment for conditions unrelated to the alleged vaccine injury do not. *Compare Wyatt v. Sec'y of Health & Hum. Servs.*, No. 14-706V, 2018 WL 7017751, at *22–23 (Fed. Cl. Spec. Mstr. Dec. 17, 2018) (petitioner's post-vaccination GBS

resolved within three months; subsequent ongoing medical treatment for upper respiratory and gastrointestinal infections did not satisfy six-month requirement), *with Herren v. Sec'y of Health & Hum. Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) (ongoing mild GBS symptoms that did not require active medical care nevertheless satisfied severity requirement).

### b. Finding of Facts

Petitioner's medical records indicate that he received the flu vaccination at issue on November 29, 2016, and that he began experiencing symptoms of his alleged GBS in December of 2016. Petitioner was admitted to the hospital and discharged on December 26, 2016, following IVIG treatment. He was noted to have normal gait at the time of his discharge.

In order to establish by preponderant evidence that his injury lasted for at least six months, Petitioner must show that he continued experiencing the residual effects of his injury until June of 2017, but Petitioner's medical records fail to provide preponderant evidence that he was experiencing symptoms in 2017. On April 2, 2017, Petitioner's ophthalmologist noted that Petitioner had been diagnosed with GBS but was "back to normal." Pet'r's Ex. 14 at 4. On July 23, 2018, a nurse practitioner noted that Petitioner had a history of GBS but that he had a "full recovery." Pet'r's Ex. 2 at 301. Issues with gait or balance were not mentioned in the medical records again until October 24, 2018, when infectious disease specialist Dr. Louie noted that Petitioner's GBS was "[i]mproved[,] but [he] still [had] balance issues." Pet'r's Ex. 3 at 3. However, Dr. Louie noted that Petitioner had a normal neurologic examination. *Id.* On November 14, 2018, Petitioner's neurologist Dr. Neophytides assessed Petitioner with "mild gait ataxia, most likely due to cerebella dysfunction, perhaps related to the history of [GBS]." Pet'r's Ex. 4 at 27. When Petitioner next returned to his neurologist on November 6, 2019, Dr. Neophytides noted that Petitioner's mild gait ataxia had not worsened since 2018 and that "it could still be within normal limits for age." *Id.* at 35.

Because the filed medical records indicate that Petitioner did not report or exhibit GBS symptoms between December of 2016 and October of 2018, it is unclear whether Petitioner suffered a new injury or age-related changes during that approximately 22-month gap.

Moreover, Petitioner's expert did not address this gap in symptoms. Although Dr. Napoli stated that ataxia is a possible residual symptom of GBS, he has not linked Petitioner's 2018 and 2019 mild gait ataxia with his 2016 GBS. And he does not address the lack of related treatment in 2017. Dr. Napoli's opinion must be weighed against multiple notations in Petitioner's medical record of a full recovery, for a determination of which scenario is more likely than not.

In his affidavit, Petitioner explained why he did not report his ongoing GBS symptoms with his ophthalmologist in 2017, and I find that reasonable. But, while he said that he instead reported these issues to his neurologist, there are no records that Petitioner saw his neurologist in 2017. Petitioner then attempted to clarify the 2018 ED visit notes by stating that he did not report he was fully recovered from his GBS and did not know why that was in the notes because he was still experiencing balance issues. Petitioner also explained that he did not seek treatment for his balance issues in the 22-month gap, because he knew there was nothing that could be done.

9

Although such evidence is entitled to consideration and has some probative value, this kind of testimonial evidence has been deemed insufficient by itself to establish severity – especially when it is countered by contrary evidence in the medical record. *See, e.g.*, *Uetz v. Sec'y of Health & Hum. Servs.*, No. 14-29V, 2014 WL 7139803, at *3–4 (Fed. Cl. Spec. Mst. Nov. 21, 2014) (finding affidavits contrary to the contemporaneous medical record did not establish a finding that the six-month requirement had been satisfied); *see also Vogler v. Sec'y of Health & Hum. Servs.*, No. 11-424V, 2014 WL 1991851, at *4, 8–10 (Fed. Cl. Spec. Mstr. Apr. 25, 2014) (recognizing that filed affidavits can "bulwark" a claim that an injury meets the six-month requirement, but not in the face of a medical record to the contrary). Here, the medical records and expert reports do not provide preponderant evidence that Petitioner suffered GBS for more than six months. Instead, the contemporaneous records reflect that Petitioner recovered from his GBS. While there are records from 2018, 2019, and 2024 that reference balance issues, there is no preponderant evidence that it is from his GBS. Furthermore, there is no explanation for the gap of GBS-related treatment beyond Petitioner's own words. Petitioner did not see his neurologist for almost two years. Therefore, it is unclear whether Petitioner suffered a new injury or age-related changes during that approximately 22-month gap rather than ongoing GBS sequala. And although Petitioner was provided with the opportunity to secure other evidence documenting his residual effects for the relevant timeframe, he failed to do so.[12]

It is true that mild residuals of an injury may not require active medical attention due to their mild nature. *See Herren*, 2014 WL 3889070, at *3. But here, not only did Petitioner's alleged mild gait ataxia not require active medical care, but Petitioner was also not actively seeing his treating neurologist during the relevant timeframe. *See id.* (finding petitioner satisfied the severity requirement because the vaccinee was still under the medical care of her neurologist).

I am aware that a variety of evidence can be used to satisfy issues like severity, and I am reluctant to dismiss a case simply on this basis, especially given the Program's emphasis on generosity in reaching entitlement decisions. *See Watts v. Sec'y of Health & Hum. Servs.*, No. 17-1494, 2019 WL 4741748, at *6 (Fed. Cl. Spec. Mstr. Aug. 13, 2019) (recognizing the generosity of the Vaccine Program and how this policy concern impacts interpretation of the Act's severity requirement). However, severity is a claim requirement, and cases may legitimately be dismissed if the record does not preponderantly reveal sufficient evidentiary support for this claim element. *Ojeda Colon v. Sec'y of Health & Hum. Servs.*, No. 18-1065V, 2021 WL 2809582 (Fed. Cl. June 3, 2021), *review den'd, decision aff'd sub nom. Colon v. Sec'y of Health & Hum. Servs.*, 156 Fed. Cl. 534 (2021); *see also Prepejchal v. Sec'y of Health & Hum. Servs.*, No. 15-1302V, 2018 WL 5782865, at *15-16 (Fed. Cl. Spec. Mstr. Oct. 5, 2018) *mot. for review den'd*, 141 Fed. Cl. 519 (2019) (finding petitioner's failure to satisfy the severity requirement as a basis for the claim's dismissal). Here, I have conducted a thorough record review in reaching my determination, and even giving Petitioner's affidavit some weight, I cannot find that severity is met.

---

[12] Instead, Petitioner filed physical therapy records from 2024.

## V. Conclusion

Based on the record as a whole, Petitioner has failed to prove by preponderant evidence that his GBS or its residual effects lasted for more than six months. Accordingly, Petitioner has not established entitlement to an award of damages, and I must **DISMISS** his claim.

**IT IS SO ORDERED.**

s/Herbrina Sanders Young  
Herbrina Sanders Young  
Special Master