# In the United States Court of Federal Claims

No. 19-1786

(Filed:  10 July 2025[*])

```
******************************************
EDWIN WEISS,                             *
                                         *
                Petitioner,              *
                                         *
v.                                       *
                                         *
SECRETARY OF HEALTH AND HUMAN            *
SERVICES,                                *
                                         *
                Respondent.              *
                                         *
******************************************
```

*Virginia E. Anello*, with whom was *Michael London*, both of Douglas & London, P.C., of New York, NY, for petitioner.

*Ryan Miller*, Trial Attorney, Civil Division, Department of Justice, of Washington, DC, for respondent.

## OPINION AND ORDER

**HOLTE**, **Judge.**

"'[W]hile most of the Nation[] . . . enjoy[s] a great[] benefit from immunization programs, a small but significant number have been gravely injured.'"  *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1325 (Fed. Cir. 2011) (quoting H.R. REP. No. 99-908, at 4 (1986)); *see also Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1364 (Fed. Cir. 2019) (Newman, J., dissenting) (quoting *National Childhood Vaccine-Injury Compensation Act: Hearing on S.2117 Before the S. Comm. on Labor & Human Res.*, 98th Cong. 2 (1984) (statement of Sen. Orrin Hatch, S. Comm. on Labor & Human Res.) ("Senator Hatch cautioned, there is 'a small but significant public health problem—the incidence of harmful and occasionally even fatal reactions to vaccines administered'").  "These few but important injuries create doubts and fears in our National Childhood Vaccination Programs."  *Boatmon*, 941 F.3d at 1364 (quoting *National Childhood Vaccine-Injury Compensation Act: Hearing on S.2117 Before the S. Comm. on Labor & Human Res.*, 98th Cong. at 3–4) (statement of Sen. Edward Kennedy, S. Comm. on Labor & Human Res.).  Congress, therefore, established the Vaccine Program to

---

[*] This opinion was initially filed under seal on 24 June 2025 pursuant to Vaccine Rule 18(b) of the Rules of the Court of Federal Claims.  The Court provided the parties 14 days to submit proposed redactions, if any, before the opinion was released for publication.  Neither party proposed redactions.  This opinion is now reissued for publication in its original form.

"compensate injured persons quickly and fairly" for injuries "either presumed or proven to be causally connected to vaccines." *Cloer*, 654 F.3d at 1325. Congress established the Vaccine Program to "compensate injured persons quickly and fairly" for injuries "either presumed or proven to be causally connected to vaccines." *Id.* "'[F]or the relatively few who are injured by vaccines,'" Congress determined the "'opportunities for redress and restitution [were] limited, time-consuming, [and] expensive.'" *Id.* (quoting H.R. REP. No. 99-908, at 6 (1986)). "[T]o limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine," Congress implemented a six-month severity rule requiring the injured persons to show, by a preponderance of evidence, the persons suffered injury for more than six months. *Id.* at 1335 (quoting H.R. REP. No. 100–391(I), at 699 (1987)). This case involves the review of a special master's decision dismissing a petitioner's case for failure to satisfy the six-month severity requirement.

Petitioner Edwin Weiss, MD moved for review of Special Master Young's decision holding he is not entitled to compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa–1–300aa-34 ("Vaccine Act"). Dr. Weiss, a generally healthy cardiologist, received an influenza ("flu") vaccination on 29 November 2016. Ten days later, Dr. Weiss fainted while out to dinner with his wife. On 22 December 2016, after experiencing headaches, dizziness, ataxia, and left-sided weakness, Dr. Weiss was admitted to the hospital and diagnosed with Guillain-Barré syndrome. Dr. Weiss completed a standard five-day course of treatment and was discharged with a marked improvement in his symptoms. Dr. Weiss alleges his Guillain-Barré syndrome was caused by the flu vaccination, and he experienced residual symptoms for longer than six months. On 27 December 2024, Special Master Young denied Dr. Weiss' petition for compensation because "[Dr. Weiss] failed to prove by preponderant evidence that his GBS or its residual effects lasted for more than six months." Decision on Six-Month Severity Requirement ("SM Dec.") at 1–2, 11, ECF No. 77.

Pursuant to the Vaccine Act, a "petition for compensation under the Program for a vaccine-related injury or death shall contain . . . an affidavit, and supporting documentation, demonstrating that the person who suffered such injury . . . suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." 42 U.S.C. § 300aa-11(c). If the Special Master finds "on the record as a whole" the petitioner did not demonstrate this six-month severity by "a preponderance of the evidence," 42 U.S.C. § 300aa-13(a)(1), this finding will be set aside only if "arbitrary, capricious, [or] an abuse of discretion." 42 U.S.C. § 300aa-12(e)(2). The Special Master in this case "considered the relevant evidence of record," "dr[ew] plausible inferences," and stated "a rational basis for the decision." *Hines v. Sec'y of Dept. of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991). For this reason, as further explained below, the Court denies petitioner's Motion for Review and sustains the Special Master's decision.

## I.    Petitioner's Medical History and Flu Vaccination

The Court's recitation of the background facts draws from the Special Master's Public Decision on Six-Month Severity Requirement and petitioner's medical records pertinent to the six-month severity issue.

On 29 November 2016, petitioner Dr. Edwin Weiss received an influenza vaccination from his employer. *See* Vaccination Record from NYU Langone ("Vaccination Record"), Pet'r's Ex. 1 at 1, ECF No. 6-1. At the time of vaccination, Dr. Weiss was a 73-year-old practicing cardiologist at NYU Langone Health System and lived an active, independent lifestyle. SM Dec. at 3. His only remarkable medical history was a diagnosis of hypertension. *See* Pet'r's Medical Records from NYU Langone ("NYU Langone Records Vol. I"), Pet'r's Ex. 2 at 1, ECF No. 6-2. On 9 December 2016, Dr. Weiss was out to dinner with his wife and experienced a fainting spell which caused him to "slump down on the table" and "black[] out." *See* Pet'r's Medical Records from NYU Neurology ("Neurology Records"), Pet'r's Ex. 4 at 2, ECF No. 10-2. An ambulance took Dr. Weiss to White Plains Hospital, where he remained overnight and was discharged the following day after an "unremarkable" stay. *See* Pet'r's Medical Records from White Plains Hospital ("WPH Records"), Pet'r's Ex. 8 at 4–5, ECF No. 15-1.

On 19 December 2016, Dr. Weiss visited his neurologist, Dr. Neophytides, with complaints of recurrent headaches and dizziness. *See* Neurology Records at 1–3. Dr. Neophytides noted that Dr. Weiss had "syncope most likely due to medication-related hypotension" as well as new "left ptosis" and "mild sensory polyneuropathy, possibly age-related" leading to diminished sensation in his toes. *Id*. at 9. Dr. Neophytides ordered brain imaging which came back normal and recommended Dr. Weiss follow up with his ophthalmologist regarding the ptosis. *Id*.

On 22 December 2016, Dr. Weiss followed up with his ophthalmologist, Dr. Levitsky, who noted "L[eft] [e]arly facial nerve palsy" and mentioned Guillain-Barré syndrome ("GBS"). *See* Pet'r's Medical Records from Dr. Levitsky ("Ophthalmology Records"), Pet'r's Ex. 14 at 4, ECF 32-4. Dr. Weiss then returned to see Dr. Neophytides with complaints of left "facial weakness," headaches, ataxia and feeling "out of balance." *See* NYU Langone Records Vol. I at 16. Dr. Neophytides subsequently admitted Dr. Weiss for further testing. *Id*. at 9, 16.

Upon admission, Dr. Weiss underwent a lumbar puncture and electromyography testing, and the results "w[ere] consistent with GBS." *Id*. at 4, 25. After a tentative diagnosis of the Miller-Fisher variant of GBS, he completed a five-day course of intravenous immunoglobulin ("IVIG") while inpatient. *Id*. at 3, 15. During his time in the hospital, Dr. Weiss continued to experience headaches which were treated with pain medication and frequent "ambulat[ion] in hallways." *Id*. at 30, 40. Dr. Weiss was discharged on 26 December 2016 with a noted "mild improvement in left-sided facial droop" and instructions to follow up with Dr. Neophytides. *Id*. at 3.

After discharge, Dr. Weiss saw Dr. Levitsky for an ophthalmology follow-up on 4 April 2017, and Dr. Levitsky noted that his GBS was "back to normal." *See* Ophthalmology Records at 4. Dr Weiss' next medical records are from 2018 and detail a variety of encounters unrelated to his hospitalization for GBS. *See* Pet'r's Medical Records from Dr. Harris Bearnot ("Dr. Bearnot Records"), Pet'r's Ex. 9 at 5, ECF No. 15-2 (pre-operative appointment in January 2018 with primary care doctor prior to cataract surgery noting nothing abnormal); *see also* Pet'r's Medical Records from Eye Center of New York, Pet'r's Ex. 10 at 1, ECF No. 32-1 (cataract surgery in January and February 2018); Pet'r's Medical Records from NYU Langone ("NYU

Langone Records Vol. II"), Pet'r's Ex. 2 at 89–95, ECF No. 6-3 (emergency room visit for atrial fibrillation in March 2018). On 23 July 2018, Dr. Weiss had a loop recorder implanted to monitor his heart, and the admitting nurse practitioner noted "Guillain-Barre syndrome following flu vaccine in 2016 (full recovery)." Pet'r's Medical Records from NYU Langone ("NYU Langone Records Vol. III"), Pet'r's Ex. 2 at 301, ECF No. 6-4.

On 24 October 2018, Dr. Weiss saw Dr. Louie, an infectious disease physician, for a consultation about receiving vaccinations after recovering from GBS because he needed an influenza vaccination for work at the hospital, per hospital policy. *See* Pet'r's Medical Records from Dr. Louie ("Dr. Louie Records"), Pet'r's Ex. 3 at 1, ECF No. 10-1. Dr. Louie noted that Dr. Weiss was "stable but given his [history of] Guillain Barre in 2016[,] he should not receive any vaccinations including flu vaccine [sic]." *Id*. at 3. Dr. Louie also added a diagnosis of "history of Guillain-Barre syndrome" to Dr. Weiss' medical record. *Id*. at 4.

On 14 November 2018, Dr. Weiss followed up with Dr. Neophytides for the first time since the 2016 admission, complaining of "poor balance" noticed during his recovery from GBS, primarily complaining when "in a narrow corridor . . . he stumbles, and he loses his balance." *See* Neurology Records at 15. After examination, Dr. Neophytides noted Dr. Weiss had "mild gait ataxia, most likely due to cerebellar dysfunction, perhaps related to the history of LGBS [Landry Guillain-Barré syndrome]," and "it has improved since then and it has not gotten worse recently." *Id*. at 18. Dr. Neophytides ordered a brain MRI and videonystagmography ("VNG"), which showed a normal brain and ruled out Benign Paroxysmal Positional Vertigo ("BPPV") and vestibular hypofunction as possible causes for gait ataxia. *Id*. at 35 (notes from 6 Nov. 2019 visit discussing results of the tests "a year ago"); *see also id*. at 46–47 (MRI report noting the brain appeared normal).

Dr. Weiss saw his primary care physician, Dr. Bearnot, for an annual physical on 5 November 2019. *See* Dr. Bearnot Records at 10–12. Dr. Bearnot noted Dr. Weiss' physical exam was within normal limits and ordered routine lab work. *Id*. Dr. Bearnot also added "[h]istory of atrial fibrillation," vitamin "B12 deficiency" and "[h]istory of Guillain-Barre syndrome" to Dr. Weiss' medical record. *Id*. at 12.

On 6 November 2019, Dr. Weiss returned to Dr. Neophytides to follow up on his gait ataxia. Neurology Records at 28. Dr. Neophytides mentioned that Dr. Weiss recovered well since his GBS in 2016 but has "been left with minimal impairment in his balance, which has not progressed." *Id*. Upon examination, Dr. Neophytides noted "Dr. Edwin Weiss has mild gait ataxia, most likely due to cerebellar dysfunction, perhaps related to the history of LGBS, but it could still be within normal limits for age." *Id*. at 31.

On 25 March 2024, at age 80, Dr. Weiss saw physical therapist Jie Lin for "imbalance," citing a history of GBS. *See* Pet'r's Medical Records from Rusk Rehabilitation, Pet'r's Ex. 28 at 3, ECF No. 69-1. Dr. Weiss noted he "thinks his imbalance is slightly worsening over the years and feels imbalance when walking down the steps and curbs" as well as "when bending forward." *Id*. at 3. Lin's evaluation noted impairments related to "balance sensory integrity and/or sensory processing" and a treatment diagnosis of "imbalance." *Id*. at 11. Lin recommended testing for BPPV and a 12-week treatment plan. *Id*. at 12.

## II.    The Petition and Procedural History Before the Special Master

On 20 November 2019, Dr. Weiss filed a petition for compensation, alleging he "suffered from and continues to suffer from Guillain-Barre Syndrome" as a direct result of his flu vaccination.  Petition Against Secretary of Health and Human Services ("Pet.") at 1, ECF No. 1.  Dr. Weiss alleged his illness was a "Table Injury" under 42 C.F.R. § 100.3(a) and lasted more than six months.  *Id.* at 1–2.  The petition was assigned to the Special Processing Unit (SPU) on 19 May 2020, and parties engaged in settlement discussions before "reaching an impasse" in October 2021.  SM Dec. at 2.

After respondent filed his Rule 4(c) report opposing compensation, "[p]etitioner's claim was transferred out of SPU because [r]espondent argued [p]etitioner failed to demonstrate that he suffered the residual effects of GBS for more than six months after the administration of the vaccine, [p]etitioner had not established a Table injury, and [p]etitioner had not established actual causation."  SM Dec. at 2, *see* Reassignment Order at 1–2, ECF No. 46 ("[T]he medical records fail to reflect that Petitioner suffered from bilateral ophthalmoparesis, as required to establish a Table injury" and thus "[p]etitioner will likely need to proceed solely on a causation-in-fact claim.").  Chief Special Master Corcoran noted "[p]etitioner may also need a medical expert to demonstrate that his alleged continued symptoms are the residual effects of GBS," referencing a "nearly two-year gap in treatment for any GBS symptoms."  Reassignment Order at 2, n.2.

After reassignment to Special Master Young and submission of expert reports, Special Master Young ordered petitioner to submit "objective evidence to support his contention that the residual effects of his injury lasted for at least six months" and subsequently requested supplemental briefings "addressing the factual issues relating to the six-month severity requirement."  Scheduling Order, ECF No. 71.

### A.    Supplemental Briefings on Six-Month Severity Requirement

On 30 August 2024, Dr. Weiss submitted supplemental briefing on the six-month severity requirement.  *See* Scheduling Order, ECF No. 71.  Petitioner argues his "medical records are limited for two years because he did not seek treatment for his balance issues understanding them to be a residual from his GBS and that there was likely nothing his physicians could do about it," and explained medical records "should not be presumed to be 'accurate and complete' as to 'all the patient's physical conditions.'"  Pet'r's Suppl. Br. at 13, 20, ECF No. 74 (quoting *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021)).  Petitioner goes on to state, "he did not mention his issues to the other providers that he did see during this two-year time period because those visits were unrelated to the condition for which he was seeing treatment," which he alleges explains the lack of GBS evaluation in his medical records.  *Id.* at 20.  Finally, petitioner argues when he did seek further care for GBS from Dr. Neophytides in 2018, he complained of "two years of balance issues" following his GBS diagnosis, and Dr. Neophytides noted abnormalities on exam, showing petitioner's residual effects from GBS greater than six-months post-vaccination.  *Id.* at 17–18.

Respondent filed a response on 14 October 2024, arguing petitioner failed to establish by preponderant evidence "he continued experiencing the residual effects of his injury until June of 2017." Resp't's Suppl. Br. at 11, ECF No. 75. Respondent acknowledges the evidence shows petitioner did not seek any treatment for GBS between December 2016 and October 2018, but argues the medical records either not mentioning GBS or stating symptoms "had resolved" were entitled to greater weight than "petitioner's later testimonial statements that were generated in the context of litigation." *Id*. at 12–13. Specifically, respondent argues petitioner's gait ataxia recorded in 2018 could just as easily be a result of "natural aging" than of his GBS. *Id*. at 12.

### B.    The Special Master's Decision Denying Compensation

On 27 December 2024, Special Master Young filed a "Decision on Six-Month Severity Requirement," concluding "[p]etitioner has failed to provide preponderant evidence that he suffered a vaccine-related injury for more than six months," and dismissed the petition. SM Dec. at 1–2. The Special Master did not discuss causation in the opinion. *See generally id*. After laying out the procedural history of Dr. Weiss' petition, the Special Master recapped Dr. Weiss' medical records, drawing heavily from the summary provided in Respondent's Supplemental Brief filed on 14 October 2024. *Compare* SM Dec. at 3–5, *with* Resp't's Suppl. Br. at 3–7. The Special Master then summarized Dr. Weiss' affidavit filed on 30 August 2024 and expert reports submitted by both parties. *See* SM Dec. at 6–8.

The Special Master, after discussing the factual and procedural background of the case, commenced an analysis to determine if Dr. Weiss met his "burden to prove his case, including the six-month severity requirement, by the preponderance of the evidence." SM Dec. at 8 (citing *Song v. Sec'y of Health & Hum. Servs*., 31 Fed. Cl. 61, 65–66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994)). The Special Master concluded Dr. Weiss' medical records "fail to provide preponderant evidence that he was experiencing symptoms in 2017," referencing ophthalmologist medical records from 2017 stating he was "back to normal" and the cardiology records from 2018 noting his history of GBS and full recovery. SM Dec. at 9 (citing Ophthalmology Records at 4; NYU Langone Records Vol. III at 301). Special Master Young then referenced additional medical records from 2018. *Id*. The Special Master explained, Dr. Weiss' infectious disease doctor, Dr. Louie, noted Dr. Weiss' GBS had improved but left him with balance issues, and Dr. Weiss' neurologist, Dr. Neophytides, found Dr. Weiss had "mild gait ataxia, most likely due to cerebella dysfunction, perhaps related to the history of [GBS]." *Id*. (citing Dr. Louie Records at 2; Neurology Records at 27). Special Master Young also noted Dr. Neophytides' 2019 assessment that "petitioner's mild gait ataxia had not worsened since 2018" and that it "could still be within normal limits for age." *Id*. (citing Neurology Records at 35). The Special Master thus found "it is unclear whether [p]etitioner suffered a new injury or age-related changes during that approximately 22-month gap." *Id*.

In considering petitioner's expert Dr. Napoli's opinion, Special Master Young stated, "[a]lthough Dr. Napoli stated that ataxia is a possible residual symptom of GBS, he has not linked [p]etitioner's 2018 and 2019 mild gait ataxia with his 2016 GBS," noting his opinion must be weighed against the medical record to determine "which scenario is more likely than not." *Id*. Special Master Young considered Dr. Weiss' affidavit and found his rationale for not reporting

his ongoing symptoms to his ophthalmologist in 2017 "reasonable," but found no records correlating Dr. Weiss' statement that he reported the issues to his neurologist in 2017. *Id*.

While the Special Master admitted the affidavit has some value, "this kind of testimonial evidence [is] insufficient by itself to establish severity—especially when it is countered by contrary evidence in the medical record." *Id*. at 10 (citing *Uetz v. Sec'y of Health & Hum. Servs*., No 14-29V, 2014 WL 7139803, at *3–4 (Fed. Cl. Spec. Mstr. Nov. 21, 2014) (finding an affidavit insufficient to overcome a lack of contemporaneous medical records to establish the six-month severity); *Vogler v. Sec'y of Health & Hum. Servs*., No. 11-424V, 2014 WL 1991851, at *4, 8–10 (Fed. Cl. Spec. Mstr. Apr. 25, 2014) (recognizing affidavits can bolster existing medical records but cannot overcome contrary medical records)). Despite giving Dr. Weiss' affidavit some weight, Special Master Young did not find preponderant evidence balance issues referenced in the 2018, 2019, and 2024 medical records were from Dr. Weiss' GBS, and thus "it is unclear whether [Dr. Weiss] suffered a new injury or age-related changes during the approximately 22-month gap rather than ongoing GBS sequala." *Id*. Special Master Young acknowledged "mild residuals of an injury may not require active medical attention," but noted Dr. Weiss was "not actively seeing his treating neurologist during the relevant timeframe." *Id*. (citing *Herren v. Sec'y of Health & Hum. Servs*., No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("residual effects of vaccine-caused injuries persisted at least six months after the petitioner's vaccination date because [petitioner] was still under the medical care of her neurologist until [greater than six months after vaccination]")).

The Special Master was "reluctant to dismiss a case simply on [severity], especially given the Program's generosity in reaching entitlement decisions," but noted "severity is a claim requirement, and cases may legitimately be dismissed if the record does not preponderantly reveal sufficient evidentiary support." *Id*. at 10 (citing *Ojeda Colon v. Sec'y of Health & Hum. Servs*., No. 18-1065V, 2021 WL 2809582 (Fed. Cl. June 3, 2021), *review den'd, decision aff'd sub nom. Colon v. Sec'y of Health & Hum. Servs.*, 156 Fed. Cl. 534 (2021)). Thus, after conducting "a thorough record review" and "giving Petitioner's affidavit some weight," the Special Master "could not find that severity is met," dismissing Petitioner's claim. *Id*.

## III.    The Parties' Expert Reports

The Court's recitation of the parties' expert reports draws from the Special Master's Public Decision on Six-Month Severity Requirement and the portions of the parties' expert reports related to the Six-Month Severity Requirement.

### A.    Petitioner's Expert Report from Dr. Salvatore Q. Napoli

Dr. Napoli, a board-certified neurologist, provides clinical care for patients with multiple sclerosis ("MS") and other neuroimmunologic conditions. Pet'r's Ex. 15 at 2 (Petitioner's Expert's Report), ECF No. 53-1. He has "never published on GBS or residuals of GBS," but "[i]n the last five years, [he] ha[s] treated approximately five cases of [non-vaccine-induced] GBS." *Id*. Despite not treating vaccine-induced GBS, Dr. Napoli has "seen in the last five years patients with neurological/autoimmune injuries, such as brachial neuritis, neuromyelitis optica . . . [,] and tumafactive multiple sclerosis, that were caused by vaccinations." *Id*.

After reciting a medical synopsis on petitioner, Dr. Napoli stated "Dr. Weiss does qualify for the diagnosis of GBS and he presents with the clinical triad of the Miller Fisher variant." *Id.* at 5. Specifically, Dr. Napoli found petitioner "experienced left-sided ophthalmoplegia, inclusive of ptosis, left-sided facial weakness, ataxia, and bilateral reduced and absent reflexes," and "[h]is laboratory testing, including elevated proteins, abnormal EMG results and increased asialo-GM1 antibodies further support the diagnosis." *Id.* Thus, Dr. Napoli concluded petitioner was correctly diagnosed with Miller Fisher variant of GBS. *See id.* at 5–6 (detailing Dr. Napoli's conclusion petitioner was correctly diagnosed with GBS).

Dr. Napoli noted "there have been studies showing that residual deficits [of GBS] can undoubtedly occur and remain more than 6 months." Pet'r's Ex 15 at 6 (Petitioner's Expert's Report). In support of this conclusion, Dr. Napoli stated "*Verboon et al* reports that in 13 patients with Miller Fisher syndrome, 2 out of 5 (40%) patients treated with intravenous immunoglobulin had residual deficits at 6 months compared to 5 out of 8 (63%) patients who were left untreated." *Id.*

Dr. Napoli found the records from Dr. Louie and Dr. Neophytides support petitioner's GBS lasted for more than six months. *Id.* at 8. Specifically, Dr. Napoli explained petitioner "saw both doctors in the Fall of 2018 and they both noted that his GBS had improved but he still had balance[] issues and gait ataxia," and when petitioner "saw Dr. Neophytides again in the Fall of 2019[,] . . . it was again noted that he had recovered well from his GBS but has been left with minimal impairment in his balance." *Id.*

Finally, Dr. Napoli explained "[a]taxia is a known residual of GBS that can linger even if the individual has recovered for the most part." *Id.* It was Dr. Napoli's "opinion to a reasonable degree of medical certainty and more probably than not that Dr. Weiss' GBS lasted longer than six months as supported by his medical records from Dr. Louie and Dr. Neophytides." *Id.*

### B.    Respondent's Expert Report from Dr. Mark B. Bromberg

Dr. Bromberg, a board-certified academic neurologist with training in neuromuscular medicine and electrodiagnosis, "frequently make[s] the diagnosis of primary demyelinating neuropathies such as the spectrum of Guillain Barré Syndrome (including Fisher variant) and chronic demyelinating disorders." Gov't Ex. A at 1 (Gov't's Expert Report), ECF No. 56-1. Dr. Bromberg has published articles and written a textbook on the diagnosis of peripheral neuropathies. *Id.*

In Dr. Bromberg's summary of petitioner's medical records, he noted the "clinical symptoms and signs are sparsely described." *Id.* at 5. Dr. Bromberg disagreed with Dr. Napoli's conclusion petitioner's "clinical history and examination includes features of GBS, and that he has the triad of the Fisher syndrome." *Id.* at 6. Dr. Bromberg explained "account must be taken of [petitioner's] age, 73 years old at time of presentation, as it is not unreasonable for there to be difficulty with tandem gait at that age." *Id.* Dr. Bromberg further explained "there is considerable variability in finding by different examiners" as to petitioner's alleged residual GBS symptoms. *Id.* at 7 (detailing the various findings of petitioner's symptoms from various providers).

Although Dr. Bromberg's expert report did not specifically address the six-month severity requirement, Dr. Bromberg opined petitioner's "issues were limited in duration, and subtle issues with challenging gait testing are related to normal changes with age." *Id.* at 8. As to petitioner's balance and gait issues, Dr. Bromberg noted petitioner's "gait disturbance represents subjective findings, which are inconsistent across time and by examiners." *Id.*

## IV.    Petitioner's Affidavit

On 30 August 2024, petitioner submitted an affidavit. *See* Pet'r's Affidavit, Ex. 29, ECF No. 73. Petitioner explained he received an influenza vaccine and "was caused to suffer Guillain-Barre Syndrome (GBS) including the pain, suffering and sequelae associated therewith, which includes balance issues [he] still experience[s] to this day." *Id.* at 1. Petitioner reported he was a "healthy individual" and "did not suffer from a neuroimmunology condition" or "suffer from any balance issues" prior to receiving the vaccine. *Id.* Petitioner instead claims he "exercised regularly and would go jogging without incident." *Id.*

Petitioner claims the onset of his GBS occurred in December 2016 and the "first thing [he] remember[s] is being out to dinner when [he] passed out." *Id.* at 2. Petitioner explains he was admitted to the hospital "for five days because Dr. Neophytides suspected GBS and [Dr. Neophytides] wanted [petitioner] to undergo a lumbar puncture and be treated with IVIG." *Id.* Petitioner explains at the time of his discharge his "condition had greatly improved, but the GBS has not completely resolved and [he] was still experiencing minor facial issues. As to [his] walking and balance, that had seemed to improve and [he] believed at the time of discharge that it had been resolved. However, that was not the case." *Id.*

Petitioner goes on to explain his "balance became the real issue," and the "balance issues started shortly after [his] discharge but they did not happen all of the time." *Id.* Petitioner noted he "continued to walk fine for the most part, but often times, [he] would lose [his] balance and almost fall; [he] felt unsteady walking which is the same as what [he] experienced when [he] first experienced the symptoms of GBS." *Id.* Despite the balance issues, petitioner explains he "did not go see a doctor for it immediately because [he] knew it was a residual from [his] GBS and that there was likely nothing [the doctors] could do about it, and [he] would have to deal with it." *Id.*

"After two years of dealing with these balance issues, however, [petitioner] felt they were starting to get worse, so [he] decided to see [his] neurologist, Dr. Neophytides, . . . who thought the balance issues could be related [petitioner's] GBS" and told him to follow-up in a year. Pet'r's Affidavit, Ex. 29 at 2–3. Petitioner followed up as instructed, but explained his "balance issues still continued to persist and they are present today," and he "feel[s] they are worsening." *Id.* at 3. Petitioner noted from March to June 2024, he "decided to try physical therapy to assist with [his] balance issues" and explained "he will likely be continuing with [his] physical therapy in the future. *Id.*

Petitioner also noted his "attorney made [him] aware of two medical records that indicate that [he] was not experiencing any residuals of [his] GBS in 2017 or 2018." *Id.* Petitioner explained, "[a]s to the April 2017 visit with [his] ophthalmologist, Dr. Levitsky, [petitioner] did

not report to [his ophthalmologist] that [his] GBS was back to normal because it was not; [he] was still experiencing balance issues." *Id.* Petitioner further explained Dr. Levitsky was his doctor related to congenital cataracts and the visit was related to the cataracts—not GBS—and he would not have reported to Dr. Levitsky he was normal because he was not. *Id.* at 3–4. Petitioner claims he "was still experiencing balance issues and [his] complaints regarding these issues went to Dr. Neophytides, [his] neurologist." *Id.* at 4. As for the July 2018 record, petitioner explained he "d[id] not know where that information would have been obtained and [he] d[id] not recall reporting that to any healthcare provider at all or any particular provider at that visit." *Id.* at 3. Petitioner further notes he "would especially not have reported to anyone that [he] was fully recovered because [he] was still experiencing balance issues." *Id.* Petitioner further notes this "visit was related to paroxysomal atrial fibrillation, and [he] was focused on getting that resolved," and he "would not have made any complaints related to [his] balance issues from GBS at that visit." *Id.* Petitioner once again maintained all his "complaints regarding balance went to Dr. Neophytides, [his] neurologist." *Id.*

## V.    Petitioner's Motion for Review and Respondent's Arguments

On 27 January 2025, petitioner moved for review of the Special Master's Decision on Six-Month Severity Requirement. *See* Mot. for Rev., ECF No. 79. Disputing the Special Master's finding "petitioner failed to provide preponderant evidence that he suffered a vaccine-related injury for more than six months," petitioner contends the Special Master's decision was "not in accordance with the law and/or was, at a minimum arbitrary and capricious because Special Master Young improperly disregarded three highly relevant notations that support that he had suffered the residuals of his vaccine-related injury for at least two years." Mot. for Rev. at 2.

Petitioner identifies these "three highly relevant notations" as:  (1) a 24 October 2018 notation by Dr. Louie noting "History of GBS" as an active problem "because Dr. Weiss had been left with balance issues relating to his GBS diagnosed in 2016;" (2) a 14 November 2018 notation from Dr. Neophytides stating petitioner "had recovered well but has been left with minor impairment in his balance;" and (3) a 6 November 2019 note from Dr. Neophytides stating petitioner had "recovered well but he has been left with minimal impairment in his balance, which has not progressed since then." *Id.* at 2 (quoting Dr. Louie Records at 4, Neurology Records at 15, 28). While petitioner concedes "the Special Master did acknowledge the existence of these three records in the decision," petitioner asserts Special Master Young "inappropriately 'donned blinders'" to these notations which purportedly show Dr. Weiss satisfied the six-month severity requirement." *Id.* at 2–3.

Petitioner argues the appropriate standard of review is "not in accordance with the law" because he believes Special Master Young "did not review the record as a whole," which is in contravention of the Special Master's requirement to "weigh the 'record as a whole' in determining the severity requirement." *Id.* at 11–12, 14 (quoting *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021)). Petitioner argues a special master should weigh contemporaneous evidence similarly and "should not limit the practical use of other evidence such as affidavits/oral testimony" but has "no license to ignore entirely significant evidence that contradicts a finding." *See id.* at 12–14 (citing *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532 (2011); *Hodge v. Sec'y of Health & Hum. Servs.*, 164 Fed. Cl. 633

(2023)).  Petitioner first points to *Kirby*, where the Federal Circuit stated "medical records should not be presumed to be 'accurate and complete' as to 'all the patient's physical conditions,'" listing a variety of reasons why information may not be in a patient's medical record including "a patient being seen for one condition . . . is not likely to mention another condition . . . nor is the physician likely to record it." *Id.* at 12 (citing *Kirby*, 997 F.3d at 1383).

Petitioner then discusses *Shapiro v. Secretary of Health and Human Services* and *Hodge v. Secretary of Health and Human Services*:  in both cases, the court found the respective Special Masters selectively reviewed and disregarded certain pieces of highly relevant evidence in medical records, so-called "donning blinders," leading the court to vacate the Special Masters' decisions denying compensation.  *See* Mot. for Rev. at 13–15 (first quoting *Shapiro*, 101 Fed. Cl. at 540 ("[T]he Special Master was not at liberty to don blinders to the portion of the letter that contradicted his findings . . ."); and then quoting *Hodge*, 164 Fed. Cl. at 646 ("[T]he special master's failure to consider these medical records . . . violates the Vaccine Act's mandate to consider the record as a whole, and therefore his conclusion on this issue was not in accordance with law.")).  Petitioner highlights how the court in *Hodge* found the Special Master's "fact findings regarding timing were arbitrary and capricious" because "the special master had not considered all of the relevant evidence in the record." *Id.* at 14 (citing *Hodge*, 164 Fed. Cl. at 646).

Petitioner argues, as in *Hodge* and *Shapiro*, "Special Master Young did not review the record as whole because she improperly disregarded three highly relevant notations in the records of the two physicians that actually treated Dr. Weiss specifically for his GBS" and "provided no weight to these notations at all." *Id.* at 14–15.  Petitioner points to four records which the Special Master "improperly gave substantial weight" because petitioner "was not seeing these physicians for his GBS." *Id.* at 16–17 (citing Dr. Bearnot Records at 4–8, 11; NYU Langone Records Vol. II at 230) (discussing two primary care appointments and an emergency room visit for an unrelated cardiac issue).  Petitioner asserts these records "do not conflict with the three notations" disregarded by the Special Master, or with Dr. Weiss' affidavit, thus "it was erroneous for Special Master Young to find otherwise." *Id.* at 17.  While petitioner notes a "record in which a nurse practitioner noted that he had a 'full recovery' of his GBS" may "arguably conflict[]" with other records, petitioner had seen the provider for atrial fibrillation, not GBS, and did not make "any complaints related to his residual balance issues," so "he does not know why the record would say he was 'fully recovered' when he was not," suggesting the provider "likely entered the information incorrectly." *Id* at 17–18.  As records from petitioner's GBS doctors discuss residual balance issues three to four months later, Petitioner argues "the weight given . . . to [the nurse practitioner record] should have diminished greatly" due to the contemporaneous conflicting medical records.  Mot. for Rev. at 18.

Petitioner next refers to *Griswold v. Sec'y of Health & Hum. Servs.*, where the petitioner also experienced GBS after a flu vaccination, recovered remarkably well, and the special master found evidence of GBS sequelae seven months post-vaccination even when "physical exams had come back arguably normal," leading the Special Master to grant compensation. *Id.* at 19 (citing *Griswold v. Sec'y of Health & Hum. Servs.*, No. 19-1674V, 2022 WL 1529489 at *7 (Fed. Cl. Spec. Mstr. Mar. 30, 2022)).  Petitioner notes the Special Master in *Griswold* found it relevant when the petitioner's provider "included GBS on [p]etitioner's list of *active problems* despite the

- 11 -

results of muscular and neurologic examinations performed during that visit being normal." *Id.* (citing *Griswold*, 2022 WL 1529489 at *7) (emphasis in original). While petitioner states "he did not seek treatment for two years [after GBS hospitalization] believing there was likely nothing his physicians could do," after seeking treatment in 2018, petitioner's providers added GBS to petitioner's "active problem list," like the petitioner in *Griswold*. *Id.* at 19–20.

Respondent disputes petitioner's assertion the "not in accordance with the law" standard of review applies, arguing petitioner "attempt[s] to benefit from the less deferential *de novo* standard" by "argu[ing] . . . the Special Master engaged in legal error in her ruling." Resp't's Resp. at 13. Instead, respondent asserts "all of the issues petitioner raised for review were clearly questions of fact, entitled to the arbitrary and capricious standard of review." *Id.*

Respondent argues the Special Master "conducted a thorough review of the record" and "[t]here is no indication the Special Master ignored notations in the records or failed to consider them in weighing the record as a whole." *Id.* at 14. Respondent noted the Special Master gave petitioner "multiple opportunities" to supplement the record with additional documentation showing residual effects of GBS "during the relevant time period, and he did not." *Id.* Responding to petitioner's "three specific notations" to which petitioner argues the Special Master "should have accorded more weight," the government points out how the Special Master "explicitly addressed those visits and records *multiple times* throughout [the] Decision, and clearly and carefully considered them." *Id.* at 14–15 (emphasis in original).

Respondent then discusses how rather than being "simply silent on petitioner's status" during the gap in care, "there were explicit notations that petitioner had a normal gait upon discharge" and petitioner "had a 'full recovery' from GBS and was 'back to normal' following GBS." *Id.* at 15 (citing SM Dec. at 4, 9). Respondent further notes how gait ataxia could be "a residual symptom of GBS" or "within normal range for petitioner's age or more likely the natural result of aging," according to the parties' experts. *Id.* (citing SM Dec. at 7–8).

Respondent also disagrees with the case law proffered by petitioner. First, respondent distinguishes this case from *Shapiro* because review of the Special Master's decision "makes clear" the Special Master did not ignore evidence, as was the case in *Shapiro*. *Id.* Similarly, respondent distinguishes *Hodge* because there, "the [S]pecial [M]aster had not considered all the evidence in the record;" yet here, "Special Master Young rendered her [d]ecision in light of the record as a whole." *Id.* at 16. Finally, the government characterizes the dispute at hand as "simple disagreements with the Special Master's factual determinations and the weighing of evidence," where petitioner "asks this Court to reconsider evidence . . . but reach a different conclusion." *Id.* at 17.

## VI. Legal Standards

### A. The Court's Standard of Review of a Special Master's Decision

The Vaccine Act provides this court jurisdiction to review a Special Master's decision upon timely motion of either party. *See* 42 U.S.C. § 300aa-12(e)(1)–(2). In reviewing the record of the proceedings before the Special Master, the Court may: (1) "uphold the findings of fact

and conclusions of law of the special master and sustain the special master's decision;" (2) "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law;" or (3) "remand the petition to the special master for further action in accordance with the court's direction." *Id.* § 300aa-12(e)(2). "Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Saunders v. Sec'y of Dept. of Health & Hum. Servs.*, 25 F.3d 1031, 1033 (Fed. Cir. 1994) (quoting *Munn v. Sec'y of Dept. of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992)).

It is not the Court's role "to reweigh the factual evidence, or to assess whether the special master correctly evaluated the evidence." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (quoting *Munn*, 970 F.2d at 871). The Court also does "not examine the probative value of the evidence or the credibility of the witnesses. These are all matters within the purview of the fact finder." *Id.* (quoting *Munn*, 970 F.2d at 871). "Reversal is appropriate only when the special master's decision is arbitrary, capricious, an abuse of discretion, or not in accordance with the law." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009). The arbitrary and capricious standard "is a highly deferential standard of review:" "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Dept. of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

### B.    The Six-Month Severity Requirement

A petitioner seeking compensation for a vaccine injury must submit a petition containing "supporting documentation, demonstrating that the person who suffered [a vaccine-related injury] . . . suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." 42 U.S.C. § 300aa-11(c)(1)(D)(i). This six-month severity is "a condition precedent to filing a petition for compensation" and is a "petition content requirement." *Cloer v. Sec'y of Health & Hum. Servs*, 654 F.3d 1322, 1335 (Fed. Cir. 2011) (en banc) (citing 42 U.S.C. §300aa-11(c)(1)(D)(i)). Petitioner must meet the severity requirement by a preponderance of the evidence. 42 U.S.C. §300aa-13(a)(1)(A); *see Song v. Sec'y of Dept. of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65–66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994) (unpublished table decision). A special master "may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. §300aa-13(a)(1)(A). Such claims may, however, have "'probative value.'" *See Colon v. Sec'y of Health & Hum. Servs.*, 156 Fed. Cl. 534, 538 (2021) (quoting *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011)). A special master must base their finding of severity "on the record as a whole," or such findings will not be "in accordance with the law." 42 U.S.C. § 300aa-13(a)(1); *Hodge v. Sec'y of Health & Hum. Servs.*, 164 Fed. Cl. 633, 646 (2023).

### VII.    Whether Six-Month Severity Must Be Proven by a Preponderance of the Evidence

As an initial matter, the parties agreed the only issue before the Court is to determine whether the Special Master's finding on severity was proper and supported by evidence in the record.[1]  *See* 13 May 2025 Oral Arg. Tr. ("Tr.") at 6:16–7:1, ECF No. 84 ("THE COURT:  [T]he Court understands that both Petitioner and the Government agree that the only issue is whether the Special Master properly determined that [p]etitioner did not meet the six-month severity requirement under 11(c)(1)(D)(i).  Is that correct?  [PETITIONER:]  That is correct . . . .  [RESPONDENT:]  Yes, Your Honor."); Tr. at 7:10–7:16 ("[THE COURT:]  So the Court's role now is to determine whether the Special Master's factual finding that [p]etitioner did not meet the six-month requirement is supported by the evidence in the record.  [PETITIONER:]  That is correct. . . .  [RESPONDENT:]  Yes, Your Honor.").  For this purpose, the parties agreed it is irrelevant whether the six months for satisfying the six-month severity requirement are measured from date of vaccination, or date of onset.  *See* Tr. at 13:04–14:12 ("THE COURT:  So for the six-month severity requirement to be met, [p]etitioner must show he continued experiencing residual effects of GBS at least until June of 2017.  Is that correct?  [PETITIONER:]  I believe that the Special Master held six months from date of onset, but like I said, here[] it's not relevant. … [RESPONDENT:]  [G]iven the parties' disparate readings of what's appropriate, it would be anywhere from May 29th through mid-June, would be where the six months would fall.  Again, as Your Honor referenced, I don't think it's terribly relevant here.")

The parties agreed this severity requirement is jurisdictional—a threshold matter condition precedent to a petition for compensation.[2]  *See supra* Section V.B; *see also* Tr. at

---

[1] The issue of whether the six-month severity requirement is jurisdictional was not raised by the parties and therefore not before the Court.  The Court notes the only case cited by the Special Master to support dismissal is *Black v. Secretary of Health and Human Services*, which determined the six-month severity requirement is jurisdictional.  *See* 33 Fed. Cl. 546, 550 (1995) (holding the requirements of subsection 11(c), including the six-month severity requirement, "are indeed jurisdictional").  According to *Cloer v. Secretary of Health and Human Services*, the six-month severity requirement is perhaps not jurisdictional; rather, "the 6 month requirement is a condition precedent to filing a petition for compensation," or in other words, is a "petition content requirement." 654 F.3d at 1335.  A "petition content requirement" necessitates petitioners adequately plead an injury longer than six months and "submit supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case."  *Id.*  The Court also understands "[d]ue to the informal style of many Vaccine Act cases, the line between determining jurisdiction and deciding the merits becomes blurred," *id.*, but the six-month severity requirement is neither a heightened pleading standard nor a jurisdictional bar to a claim under the Vaccine Act; instead, a petitioner must adequately plead an injury longer than six months and provide documentation supporting such.  *See id.*  The six-month severity requirement is a "petition content requirement" (*i.e.*, pleading requirement) that must be proven by record evidence.  *See id.*; *see also* 42 U.S.C. § 300aa-13(a)(1)(A) (explaining compensation shall be awarded under the Vaccine Act if the Special Master finds "on the record as a whole" the "petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa-11(c)(1)," including the six-month severity requirement).

[2] The Court notes this is a rare case of dismissal for failure to show six-month severity, in which a large gap separates records of treatment and records of residual effects.  For examples of the severity requirement being jurisdictional, respondent cited three cases:  *Song*, 1993 WL 534746, *aff'd*, 31 Fed. Cl. 61, *aff'd*, 4 F.3d 1520; *Colon*, 2021 WL 2809582, *aff'd*, 156 Fed. Cl. 534; and *Stavridis v. Secretary of Health & Human Services*, 2009 WL 3837479 (Fed. Cl. Spec. Mstr. Oct. 29, 2009).  *See* Tr. at 29:23–30:23 (citing *Song*, *Colon*, and *Stavridis*).  In *Song*, a new-born had seizures after vaccination, but these stopped after just one week.  1993 WL 534746 at *1.  Three years later, a neurological report showed some evidence of delayed language functions, which petitioner alleged was vaccine-related.  *Id.* at *2.  The Special Master found no six-month severity, but did not treat it as a jurisdictional issue—the Special Master denied the claim after holding a hearing and receiving expert testimony.  *Id.* at *1.  In *Colon*, a 70-year-old had GBS-related left foot drop and numbness, and unrelated gastrointestinal symptoms.  1993

8:14–8:18 ("THE COURT:  And the parties agree, beginning with [p]etitioner, that the requirements under subsection 11(c) are a threshold matter?  [PETITIONER:]  That is correct.  [RESPONDENT:]  Yes, Your Honor."); Tr. at 7:17–7:22 ("THE COURT:  And to confirm regarding the requirement, the six-month severity requirement is a condition precedent to filing a petition for compensation.  [PETITIONER:]  Yes, Your Honor.  [RESPONDENT :]  Yes, Your Honor."); Tr. at 29:14–29:19 ("THE COURT:  And I think we already established that you both agree that this requirement, this six-month requirement from 11(c), is jurisdictional to be met.  [PETITIONER:]  Correct.  [RESPONDENT:]  Yes.").

As the Special Master found the six-month severity requirement not met, the Special Master did not make a determination as to whether petitioner's "illness . . . injury, condition, . . . in the petition [was] due to factors unrelated to the administration of the vaccine described in the petition" and therefore entitled to compensation.  42 U.S.C. § 300aa-13(a)(1)(B); *see* Tr. at 7:25–8:5 ("THE COURT:  And the Special Master in this case did not make any causation determination because she found that the six-month severity requirement was not met.  [PETITIONER:]  That is correct.  [RESPONDENT:]  Yes, Your Honor."); Tr. at 8:14–8:18 ("THE COURT:  And the parties agree, beginning with [p]etitioner, that the requirements under subsection 11(c) are a threshold matter?  [PETITIONER:]  That is correct.  [RESPONDENT:]  Yes, Your Honor.").

The parties further agreed petitioner must prove six-month severity by a preponderance of the evidence, or "50 percent and a feather."  *See supra* Section V; *see also* Tr. at 8:19–8:23 ("THE COURT:  And under 11(c) requirements, including the six-month severity requirement, . . . that must be proven by a preponderance of the evidence.  [PETITIONER:]  That is correct.  [RESPONDENT:]  Yes, Your Honor."); Tr. at 27:11–27:18 ("[RESPONDENT:] [T]he standard is more likely than not.").[3]

---

WL 534746 at *3.  Some records showed the GBS-related symptoms improved, but did not show they stopped.  *Id.* at *3–4.  The last record of GBS was two months short of the statutory requirement and was not mentioned again until six years later:  records of gastrointestinal symptoms continued however, and petitioner argued these showed severity.  *Id.* at *4–5.  The Special Master disagreed—on the record alone and without a hearing—and 'dismissed' for lack of severity.  *Id.* at *1.  In *Stavridis*, petitioner's son was diagnosed with autoimmune hemolytic anemia days after vaccination, but a treatment of steroids appeared to resolve the issues after about four months.  2009 WL 3837479 at *1.  Beyond a low white blood cell count that was within normal range, petitioner offered no medical record of injury after six months.  *Id.*  Like *Colon*, the Special Master in *Stavridis* dismissed without a hearing.  2009 WL 3837479 at *2.  The case before the Court is distinguishable from all three cases.  Unlike *Stavridis*, a medical record of injury after six months has been produced.  SM Dec. at 5.  Unlike *Colon*, the gap in vaccine-related symptoms is much shorter—22 months compared to six years—but petitioner produced no contemporary records of other symptoms to bridge the gap.  SM Dec. at 9.  Unlike *Song*, where later delayed language development is different than the original onset seizure symptoms, petitioner's later and onset symptoms are the same symptoms of balance issues.  SM Dec. at 3–5.  More to the point, unlike *Song*—the only example affirmed by the Federal Circuit—the finding under review here was made without a hearing.  SM Dec. at 2–3.

[3] To support this principle, respondent cited *Song v. Secretary of Health & Human Services* and *Uetz v. Secretary of Health & Human Services*. 1993 WL 534746, *aff'd*, 31 Fed. Cl. 61, 65-66 (1994) ("Petitioner must establish by a preponderance of the evidence the matters required in the Petition Content section, § 11(c)."), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994); 2014 WL 7139803 at *3 (Fed. Cl. Spec. Mstr. Nov. 21, 2014) ("As with all elements of a vaccine claim, the conditions precedent must be proven by preponderant evidence."); *see also* Tr. at 9:22–10:9.  Petitioner cited *Tackett v. Secretary of Health & Human Services* which also used the preponderance standard.  2023 WL 6995391 at *8 (Fed. Cl. Spec. Mstr. Sept. 25, 2023).

The parties conceded petitioner's testimony can have probative value to support severity but cannot stand alone. *See supra* Section V.B; *see also* Tr. at 28:13–28:25 ("THE COURT:  So the statement from Black is correct [that 'Petitioner is required to "submit supporting documentation which reasonably demonstrates that the alleged injury, or its sequelae, lasted for more than six months"']?  [PETITIONER:]  Correct. . . .  [RESPONDENT:]  I agree that Petitioner cannot establish Petitioner has met the severity requirement based on his statements alone, and that's in the statute as well.  [THE COURT:]  … do you disagree that statements from the [p]etitioner can also be allowed?  [RESPONDENT:]  Are permitted to be considered as evidence?  Yes.").

Petitioner agreed the only evidence supporting the six-month severity requirement besides contemporaneous records were (1) the affidavit and (2) the 2024 physical therapy records, which petitioner set aside for the issues under review. *See* Tr. at 26:12–26:16 ("THE COURT:  [T]he only other items, other than contemporaneous medical records, were the March 2024 physical therapy records and the affidavit from Petitioner.  [PETITIONER:]  That is correct."); Tr. at 23:23–24:1 ("[PETITIONER:]  [F]or purposes of this [motion for review], I'm not focusing on the 2024 medical records.").  No records supporting severity were submitted during the 22-month gap. *See* Tr. at 26:17–26:21 ("THE COURT:  Related to what we'll call the 22-month gap, you agree that there are no medical records from the 22-month gap that support GBS.  [PETITIONER:]  That there are no medical records, that is correct.").[4]

## VIII.   The Proper Legal Standard for the Court to Use in Reviewing the Special Master's Decision

The Special Master must consider the record as a whole to be in accordance with the law; if not, the Court would review the Special Master's decision *de novo*. *Hodge v. Sec'y of Health & Hum. Servs.*, 164 Fed. Cl. 633, 641 (2023) (explaining Federal Circuit precedent requires a special master "must not focus on individual pieces of evidence at the expense of determining what is depicted by the record as a whole").  Petitioner initially argued the Court should find the

---

[4] As the Special Master did not clarify the case was being dismissed for lack of jurisdiction, the Court questions the dismissal procedure used by the Special Master for failure to meet the six-month severity requirement, rather than holding a hearing on the merits. *See* SM Dec. at 10 ("I am aware that a variety of evidence can be used to satisfy issues like severity, and I am reluctant to dismiss a case simply on this basis, especially given the program's emphasis on generosity in reaching entitlement decisions.  However, severity is a claim requirement, and cases may legitimately be dismissed if the record does not preponderantly reveal sufficient evidentiary support for this claim element." (citations omitted)).  As the Special Master determined petitioner did not meet the six-month severity requirement "claim element," the Court doubts the Special Master's dismissal was on jurisdictional grounds. *See id.*; *see also supra* note 3.  The Court does not address whether the dismissal procedure used by the Special Master was proper because petitioner did not argue a procedural issue with respect to the Special Master's dismissal versus denial of petitioner's claim. *See generally* Pet'r's Mot. for Rev.  Additionally, there is no practical difference in the outcome of the case if the Special Master dismissed the case on jurisdictional grounds or if the Special Master factually determined the six-month severity requirement was not satisfied by a preponderance of the evidence— either way petitioner would not be able to sustain a claim for compensation.  Finally, given petitioner did not raise a due process claim as to the Special Master's dismissal procedure, if petitioner is unable to identify something from the record which the Special Master did not review or consider, the Court cannot overturn the Special Master's decision. *See Hines v. Sec'y of Dept. of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991) ("If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate.").

Special Master's decision "not in accordance with the law" and review the decision *de novo* because the Special Master, having disregarded three notations from 2018 and 2019, did not review "the record as a whole." *See* Tr. at 41:16–41:20 ("[PETITIONER:] [B]ecause the Special Master disregarded records in making a finding as to this particular medical record, … it was a disregard of the record as a whole and would violate the legal mandate to do so."); Tr. at 49:23–51:3 ([PETITIONER:] Again, I don't think that the Court properly gave weight [] or, . . . properly considered, didn't even mention, disregarded the three notations … [and] by disregarding that record, which … Petitioner was clearly relying upon, it was, again, not in accordance with the law.").

At oral argument petitioner agreed if the Special Master did consider the record as a whole, the Court may reverse the finding only for being arbitrary and capricious. *See supra* Section V.A; *see also* Tr. at 40:12–40:15 ("THE COURT:  What is the standard that the Court needs to use in order to review the Special Master's consideration of these records? [RESPONDENT:]  Arbitrary and capricious."); Tr. at 48:11–48:17 ("THE COURT:  Isn't the role of the Special Master then to take the gap, plus the mixed records, reviewing everything as a whole, and make a conclusion of fact that I then review for arbitrary and capricious? [PETITIONER:]  So long as she has reviewed the record as a whole, yes.").  Petitioner, on the other hand, maintained even under an arbitrary and capricious standard, the Special Master's finding should be reversed.  Tr. at 17:6–17:9 ("[PETITIONER:]  However, I do believe that under even the arbitrary and capricious standard, that has not been met here because the Court has not reviewed the record as a whole.").

## IX.    Whether the Special Master Considered the Record as a Whole

As discussed in Section V, *supra*, petitioner argues the Special Master "improperly disregarded three highly relevant notations . . . that support that [petitioner] had suffered the residuals of [a] vaccine-related injury for at least two years."  Mot. for Rev. at 1.  Specifically, the "three highly relevant notations" petitioner relies on are:  (1) a 24 October 2018 notation by Dr. Louie noting "History of GBS" as an active problem "because Dr. Weiss had been left with balance issues relating to his GBS diagnosed in 2016;" (2) a 14 November 2018 notation from Dr. Neophytides stating petitioner "had recovered well but has been left with minor impairment in his balance;" and (3) a 6 November 2019 note from Dr. Neophytides stating petitioner had "recovered well but he has been left with minimal impairment in his balance, which has not progressed since then."  *Id.* at 2.  Respondent argues the Special Master "conducted a thorough review of the record" and "[t]here is no indication the Special Master ignored notations in the records or failed to consider them in weighing the record as a whole."  Resp't's Resp at 14.  Specifically, respondent argues the Special Master "explicitly addressed those visits and records *multiple times* throughout [the] Decision, and clearly and carefully considered them."  *Id.* at 14–15 (emphasis in original).  The Court, therefore, analyzes whether the Special Master properly considered the record as a whole.

To begin, the Court looked at whether the Special Master considered the 24 October 2018 notation.  Respondent explained the 24 October 2018 notation was "cited twice and discussed thoroughly."  Tr. at 32:15–17.  Petitioner agreed the Special Master cited and directly quoted the 24 October 2018 notation in the decision.  *See* Tr. at 32:19–33:2 ("[THE COURT:]  [L]ooking at

the October record, it was cited . . . on page 5 [of the Special Master's decision] and [was] directly quoted, and then was again mentioned by the Special Master on page 9 and directly quoted as well. [PETITIONER:] Correct."). Specifically, petitioner agreed the Special Master concluded the 24 October 2018 notation found petitioner "had a normal neurological examination." *See* Tr. at 33:3–19 ("[THE COURT:] [T]he Special Master concluded at page 9 of the decision, related to [the 24 October 2018] notation, 'Noted that [p]etitioner had a normal neurological examination. . . .' [PETITIONER:] Yes, I would agree that there was a normal neurological examination. THE COURT: That's what the Special Master concluded. [PETITIONER:] Correct."). While respondent agrees the 24 October 2018 notation was "one of the records in which alleged ongoing residuals were actually mentioned," Tr. at 34:7–10, and petitioner's provider "is noting symptoms relating back to GBS," Tr. at 35:2–10, respondent maintains the Special Master "view[ed] the record as a whole, which is [a Special Master's] obligation under the standards of the Act," Tr. at 35:22–36:5. Accordingly, the Special Master considered the 24 October 2018 notation. *See Hines v. Sec'y of Health and Hum. Servs.*, 940 F.2d 1518, 1527 (Fed. Cir. 1991) (explaining a Special Master's task is to "consider[] the relevant evidence of record as a whole").

As to the 14 November 2018 notation, petitioner agreed the Special Master again quoted this notation twice in the decision. *See* Tr. at 37:6–11 ("THE COURT: Moving on to the next notation, November 2018, [does] [p]etitioner[] agree that the Special Master once again directly quotes this twice? [PETITIONER:] [Petitioner] agree[s] that [the Special Master] quotes the record, not all of it, but she quotes portions of the records twice."). Specifically, petitioner agreed the Special Master concluded the 14 November 2018 notation explained petitioner was able to walk well but was still experiencing some balance issues, which the Special Master found—directly quoting the notation—were attributable to age-related issues. *See* Tr. at 37:19–38:8 ("THE COURT: So for [the 14 November 2018] record the Special Master concluded, '[p]etitioner complained of poor balance,' but then noted . . . , '[p]etitioner was 75 years old by that point,' and directly quoted the notation describing poor balance difficulties applicable to age-related issues. . . . So the conclusion for the Special Master on this notation of November 2018, 'able to walk well, but when he would find himself in a narrow corridor, such as a theater, he would stumble and lose his balance.' Those were trumped up to age-related issues. [PETITIONER:] By the Special Master, yes."). Respondent acknowledged the 14 November 2018 notation indicated petitioner's balance issues could have been related to petitioner's history of GBS, but maintained the Special Master did not ignore this when deciding if petitioner satisfied the six-month severity requirement. *See* Tr. at 38:25–39:19 ("[THE COURT:] [The government] agree[s] that there are aspects of [the 14 November 2018] medical record that directly indicate symptoms and even 'perhaps related to LGBS'? [RESPONDENT:] [The government] agree[s] that the provider considered it's possible [petitioner's] gait issues were related to his history of GBS and that the Special Master explicitly noted that in [the] decision, showing clearly [the Special Master] did not disregard that notation and there's case law that actually says a Special Master, even if they don't weigh a piece of evidence heavily, their mere discussion of it shows that they did not disregard it in a way that would be inappropriate. So [the Special Master] not only cites to this record, [but] cites [t]o that evidence, clearly took it into consideration in considering the record as a whole, and so that completely undercuts any argument that [the Special Master] disregarded the evidence."). The Special Master therefore considered the 14 November 2018 notation, drew plausible inferences from the notation, and

- 18 -

used it to articulate a rational basis for the decision. *See Hines*, 940 F.2d at 1527 (explaining a Special Master's task is to "consider[ ] the relevant evidence in the record as a whole, draw[ ] plausible inferences and articulate[ ] a basis for his decision which is rational").

For the 6 November 2019 notation, petitioner agreed the Special Master considered petitioner's neurological examination noting petitioner's symptoms could have been related to a history of GBS, but also could have still been within normal limits for petitioner's age. *See* Tr. at 42:16–22 ("[THE COURT:] [T]he Special Master even went so far as to note the neurological assessment . . . . The Special Master quoted, 'most likely due to cerebral dysfunction, perhaps related to the history of LGBS, but it could still be within normal limits for age.' [PETITIONER:] That was the November 2019 record."). Even though petitioner agreed the Special Master cited to the 6 November 2019 notation, petitioner maintains the Special Master "ignored everything" in the record indicating petitioner was still suffering balance issues form GBS. *See* Tr. at 44:10–23 ("[THE COURT:] [The Special Master's] conclusion related to . . . not age-related Guillain-Barre, just age-related mobility, as opposed to ongoing LGBS symptoms. [PETITIONER:] But still . . . one of the problems with [the Special Master's] decision is that . . . [the] decision and [] findings indicate that [petitioner's symptoms] had been not happening for the last two years. . . . [The Special Master] ignored everything that says that [petitioner's symptoms are] still ongoing and that it was just kind of happening and that's why [petitioner] was seeking treatment for it."). In petitioner's view, the Special Master's decision "focuses so much on the fact that there were no records of treatment in t[he] 22-month" gap, it "disregard[ed] the record[s] that indicated that [petitioner] was experiencing these balance issues during that two-year period and that [the balance issues] cannot be related to his GBS." Tr. at 45:12–19. When pressed as to whether petitioner believed the Special Master was "doing anything more than making a factual finding after weighing the evidence," petitioner agreed this was not the case. *See* Tr. at 45:20–46:16. Petitioner agreed the Special Master considered the 6 November 2019 notation, in conjunction with the other records, and concluded "'[i]t is unclear whether [p]etitioner suffered a new injury or age-related changes during that 22-month gap.'" Tr. at 46:19–22. Despite petitioner's argument to the contrary, the Special Master did consider the 6 November 2019 notation. *See Hines*, 940 F.2d at 1527 (explaining a Special Master's task is to "consider [ ] the relevant evidence in the record as a whole").

Although petitioner agrees the Special Master acknowledged, cited, and quoted the 24 October 2018, 14 November 2018, and 6 November 2019 notations, *see* Tr. 31:22–32:1 ("THE COURT: You agree that the Special Master related to the three records did acknowledge the existence of the records, correct? [PETITIONER:] Correct, and I put that in my motion as well."), petitioner maintains the Special Master "ignored everything" in the record supporting petitioner still had ongoing GBS symptoms and residuals, *see* Tr. at 44:14–23 ("[PETITIONER:] [O]ne of the problems with [the Special Master's] decision is . . . her findings indicate that [GBS residuals] had not been happening for the last two years. . . . [The Special Master] ignored everything that says that [GBS residuals are] still going and that it was just kind of happening."). Petitioner argues the Special Master was "in violation of the law" because the Special Master did not include "helpful" notes from those notations. *See* Tr. at 45:12–19 ("[PETITIONER:] [The Special Master] focuses so much on the fact that there were no records of treatment in th[e] 22-month . . . period[] that she's not acknowledging and disregarding the record that indicated that [petitioner] was experiencing these balance issues during that two-year period and that it cannot

be related to his GBS."). As established *supra*—and admitted to by petitioner—the Special Master did not ignore the three notations; rather, the Special Master cited, quoted, and considered the notations in reaching a decision. Petitioner even agrees the special master was "making a factual finding after weighing the evidence." *See* Tr. at 45:20–23 ("THE COURT: Do[es] [petitioner] think that the Special Master was doing anything more than making a factual finding after weighing the evidence? [PETITIONER:] I don't think so."). Additionally, petitioner acknowledged the briefs before the Special Master included petitioner's reliance on "helpful" material from the notations. *See* Tr. at 40:19–41:13 ("[PETITIONER:] [Petitioner] wasn't only referring to [the Special Master's disregard] of the findings of the doctor about the history of GBS, and it could possibly be related. . . . [Petitioner] called the Court's attention to it in [the] brief. The Court knew I was relying upon this statement that has been completely disregarded."). The Special Master was therefore not "ignoring" or "disregarding" the three notations; instead, the Special Master was "consider[ing] the relevant evidence in the record as a whole" as required under law. *Hines*, 940 F.2d at 1527.

Respondent further argues the Special Master could not have reached a decision without considering all the notations in petitioner's medical records. *See* Tr. at 39:14–19, 40:5–40:15. Petitioner disagrees with respondent's notion the Special Master reviewed the record as a whole. *See* Tr. at 40:16–41:20 ("THE COURT: Does Petitioner disagree [ ] that [the Special Master reviewed the record as a whole]? . . . [PETITIONER:] [Petitioner] wasn't only referring to [the Special Master's] disregard of the findings of the doctor about the history of GBS, and it could be possibly related. [Petitioner] was referring to the fact that [the doctor] actually, right after one sentence where he talks about . . . [petitioner's] difficulties in narrow corridors, that it's been going on for two years since his GBS bout, [petitioner] would say . . . that notation was disregarded with . . . intentional[ ] disregard[ ], because [petitioner] called the [Special Master]'s attention to it in [the] brief. The [Special Master] knew [petitioner] was relying upon this statement that has been completely disregarded."). Supporting the Special Master reviewed the record as a whole, the Special Master in the "Finding of Facts" section of the decision detailed the Special Master's factual findings based on petitioner's medical records. *See* SM Dec. at 9–11. Specifically, just as with the three notations discussed *supra*, the Special Master cited and quoted numerous other records: (1) 26 December 2016 discharge notation explaining petitioner "was noted to have normal gait at the time of his discharge," *id.* at 9; (2) 2 April 2017 ophthalmology notation explaining petitioner "had been diagnosed with GBS but was 'back to normal,'" *id.* (citing Ophthalmology Records at 4); (3) 23 July 2018 notation from a nurse practitioner noting petitioner "had a history of GBS but that he had a 'full recovery,'" *id.* (citing NYU Langone Records Vol. III at 301). The Special Master also considered petitioner's expert report, *see id.* (explaining how petitioner's expert did not address the gap in petitioner's symptoms, link petitioner's post-gap balance issues with the 2016 GBS diagnosis, and the multiple notations noting petitioner had a full recovery) and petitioner's affidavit, *id.* (detailing petitioner's statements from the affidavit). The Special Master explained "the medical records and expert reports do not provide preponderant evidence that [p]etitioner suffered GBS for more than six months" because "the contemporaneous records reflect that [p]etitioner recovered from his GBS." *Id.* at 10. The Court "generally presume[s] that a special master considered the relevant record evidence even though [the decision] does not explicitly reference such evidence in [the] decision." *Moriarty v. Sec'y of Health and Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) (citing *Hazlehurst v. Sec'y of Health and Hum. Servs.*, 604 F.3d 1343, 1352 (Fed. Cir.

2010)).  As the Court determined the Special Master considered the 24 October 2018, 14 November 2018, and 6 November 2019 notations, and the Special Master explained all records were reviewed in making a determination, the Court finds the Special Master reviewed the record as a whole.  *See id.* (explaining the Court "generally presume[s] that a special master considered the relevant record evidence even though [the decision] does not explicitly reference such evidence in [the] decision"); *Hines*, 940 F.2d at 1527 (explaining a Special Master's task is to "consider . . . the relevant evidence in the record as a whole").

## X.    Whether the Special Master's Decision Finding Petitioner Did Not Satisfy the Six-Month Severity Requirement Was Arbitrary and Capricious

Although petitioner requests the Court review the Special Master's decision *de novo*, petitioner maintains the Special Master's decision should be vacated even under the arbitrary and capricious standard.  *See* Tr. at 47:6–16 ("[PETITIONER:]  [B]ecause of [the Special Master] not considering everything as a whole, it would be a violation of the legal mandate . . . . However, even under the arbitrary and capricious standard, [petitioner] think[s] it would be the same finding that this decision needs to be set aside as incorrect.").  Having determined the Special Master reviewed the record as a whole, *see supra* Section IX, the Court reviews the Special Master's decision under the arbitrary and capricious standard to analyze whether the Special Master erred in concluding petitioner did not satisfy the six-month standard by a preponderance of the evidence, *see supra* Section VIII (explaining petitioner agreed if the Special Master reviewed the record as a whole then the Court should use the arbitrary and capricious standard in reviewing the decision).

Petitioner argues the Special Master "improperly disregarded" notations in petitioner's medical records.  Mot. for Rev. at 1–2.  The Vaccine Act does not require the Special Master to "quote explicitly to" a specific notation, *see* Tr. at 41:23–42:2; rather, the Vaccine Act only requires the Special Master to make a determination "on the record as a whole" that "petitioner has demonstrated by a preponderance of the evidence matters required in the petition."  42 U.S.C. § 300aa-13(a)(1)(A).  Petitioner, therefore, is "equating disregarded with not quoting explicitly to."  Tr. at 41:23–24.  Here, the Special Master directly quoted *and* cited the three notations petitioner argues were "disregarded."  *See* Section IX.  The Special Master further noted petitioner's neurological examination in November 2019 contemplated the balance issues were "perhaps related to the history of LGBS, but it could still be within normal limits for age," demonstrating the record was considered as a whole.  *See* SM Dec. at 9 (citing Neurology Records at 28–40).  Additionally, following the twenty-two-month gap in petitioner's medical records denoting balance issues, the record contained "mixed" notations (*i.e.*, GBS residuals versus age related changes), which the Special Master had to review, weigh, and make a conclusion of fact—and the Court reviews to determine whether the Special Master's conclusion was arbitrary and capricious.  *See* Tr. at 48:8–17 ("[THE COURT:]  [A]fter the 22-month gap, there's mixed records.  [PETITIONER:]  Correct. . . .  [THE COURT:]  [I]sn't the role of the Special Master then to take the gap, plus the mixed records, reviewing everything as a while, and make a conclusion of fact that [the Court] then review[s] for arbitrary and capricious[ness]?  [PETITIONER:]  So long as [the Special Master] has review the record as a whole, yes.").  As such, the Court cannot "reweigh the factual evidence or [] assess whether the special master correctly evaluated the evidence."  *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357,

1360 (Fed. Cir. 2000) (quoting *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 871 (Fed. Cir. 1992).

Petitioner challenges the Special Master's decision arguing the "evidence in the record, when reviewed as a whole, supports that Dr. Weiss has met the six-month severity requirement in that he has experienced the residual effects of GBS (i.e. balance issues) for more than six months." Mot. for Rev. at 14.  Specifically, as discussed *supra* Section IX, petitioner only challenges the Special Master's review of the record as to the three 24 October 2018, 14 November 2018, and 6 November 2019 notations, which petitioner argues "standing alone support the ongoing nature of Dr. Weiss' GBS-related balance issues between 2016 and 2018." *See id.* at 2.  In petitioner's view, the Special Master "donned blinders" and ignored these notations, which supports petitioner suffered GBS residuals for at least six months.  *See id.* at 3. Petitioner relies on *Shapiro v. Secretary of Health and Human Services* to support the Special Master "donned blinders," but such reliance is misplaced.  In *Shapiro*, the Special Master "when . . . refer[ring] to 'preponderant evidence' as supporting the early onset of petitioner's symptoms the only document . . . cited was [a provider]'s letter—and as it turns out, [the Special Master] was only citing the first page of that document."  *See Shapiro v. Sec'y of Health and Hum. Servs.*, 101 Fed. Cl. 532, 540 (2011).  The court found the "Special Master was not at liberty to don blinders to the portion of the letter that contradicted [the] findings."  *Id.*  In other words, *Shapiro* was binary—the evidence is either ignored or not ignored—and disallowed completely disregarding portions of a record contradicting a Special Master's finding.  The Special Master in this case, however, did not completely disregard portions of the record; rather, the Special Master acknowledged some of the records contained notes petitioner was suffering from balance issues.  *See* SM Dec. at 9 ("On November 14, 2018, Petitioner's neurologist Dr. Neophytides assessed Petitioner with 'mild gait ataxia, most likely due to cerebella dysfunction, perhaps related to the history of [GBS].' When Petitioner next returned to his neurologist on November 6, 2019, Dr. Neophytides noted that Petitioner's mild gait ataxia had not worsened since 2018 and that 'it could still be within normal limits for age.'" (citations omitted)).  As *Shapiro* was a binary issue—whether medical records were ignored or not ignored by the Special Master—it is inapplicable to this case where the Special Master considered all notations in the record, including notations supporting petitioner had GBS residuals, and weighed the evidence to make a factual determination petitioner did not prove the six-month severity requirement by a preponderance of the evidence.  *See Lampe*, 219 F.3d at 1360 (explaining it is not the Court's role "to reweigh the factual evidence, or to assess whether the special master correctly evaluated the evidence" (quoting *Munn*, 970 F.2d at 871)).

Petitioner argues the "Special Master improperly gave substantial weight" to "four records of Dr. Weiss; providers who did not treat him for his GBS" even though "three of these records do not conflict with his GBS-treating physicians' notations and his Affidavit; rather they are simply silent as to Dr. Weiss' ongoing balance issues."  Mot. for Rev. at 16–17; *see id.* at 17 (explaining the 3 January 2018, 4 March 2018, and 5 November 2019 notations were from providers not related to petitioner's GBS and did not accurately address his symptoms). Respondent, however, maintains the Special Master correctly weighed the evidence and argues these records were not simply silent as to petitioners' status and recovery; rather, the medical record as a whole contained explicit notations that petitioner was not suffering from GBS and/or

its residuals.[5]  *See* Resp't's Resp. at 15 ("[P]etitioner had a normal gait upon his discharge in December 2016, and his treaters documented explicitly that he had a 'full recovery' from GBS and was 'back to normal' following GBS." (citations omitted)).  Contrary to petitioner's position, the Special Master did not focus just on the records from providers not treating petitioner for GBS, but looked at all the records in making a determination.  *See supra* Section IX (detailing how the Special Master reviewed not only the three notations petitioner relies upon but all petitioner's medical records); *see also* SM Dec. at 9–11 (detailing the Special Master's findings of fact.  The Special Master therefore thoroughly reviewed the evidence, and ultimately came to a conclusion:  because "the filed medical records indicate that [p]etitioner did not report or exhibit GBS symptoms between December of 2016 and October of 2018, it is unclear whether [p]etitioner suffered a new injury or age-related changes during that approximately 22-month gap."  *See id.*  Petitioner disagrees with the Special Master's factual findings based upon the weighing of evidence to determine petitioner did not satisfy the six-month severity requirement.  Such disagreements, however, seek the Court to reweigh evidence already considered by the Special Master.  "[I]t is not ... the role of this court to reweigh the factual evidence, or to assess whether the special master correctly evaluated the evidence."  *Munn*, 970 F.2d at 871.  "'[A]rbitrary and capricious' is a highly deferential standard of review.  If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines*, 940 F.2d at 1528; *see also Lampe*, 219 F.3d at 1360 ("The arbitrary and capricious standard of review is difficult for an appellant to satisfy with respect to any issue, but particularly with respect to an issue that turns on the weighing of evidence by the trier of fact.").  The Special Master thoroughly reviewed the evidence, but plausibly and rationally concluded petitioner did not meet the six-month severity requirement.  *Hines*, 940 F.2d at 1527.

At oral argument the Court extensively discussed the medical records, or lack thereof, considered by the Special Master with the parties.  As to the twenty-two-month gap between petitioner's discharge and his next visit related to GBS, petitioner agreed there were no medical records during that time, only petitioner's affidavit and the expert report.  *See* Tr. at 48:4–48:7 ("THE COURT:  Well, just to confirm, in the 22-month gap, what records were missed? . . . [PETITIONER:]  In the 22-month gap, there were no records.").  Petitioner's only explanation for the gap in the medical records was petitioner did not seek treatment because he thought there was nothing more the doctors could do for him.  *See* Tr. at 60:20–61:1 ("THE COURT:  Any

---

[5] Although not in the briefing or the Special Master's decision, respondent explained there *is* evidence in the record petitioner had balance issues prior to receiving the vaccine.  *See* Tr. at 77:3–22 ("[RESPONDENT:] [p]etitioner's counsel said twice now, the second time being just a moment ago, that [p]etitioner had no previous gait or balance issues, and particularly referred to single-leg stance, and [the government] direct[s] [the Court's] attention to a record that [p]etitioner cited in the slide, but not this portion of it, and it is Exhibit 2 at page 23, and in that record it discusses the single-leg stance, and this is a physical therapist's assessment from December 23rd of 2016, so while he is still hospitalized. And it says, "Patient demonstrates single-limb stance and dynamic high-level balance deficits as described above; however, these deficits may be preexisting to patient's current condition, especially due to his report of self-recognition of impaired single-leg stance over the last two to three years he attributes to older age.").  Since this issue was not raised prior to oral argument, the Court does not consider this evidence in determining whether the Special Master's decision was arbitrary or capricious, but presumes the Special Master considered this evidence when making a determination on the six-month severity requirement.  *See Moriarty v. Sec'y of Health and Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) (citing *Hazlehurst v. Sec'y of Health and Hum. Servs.*, 604 F.3d 1343, 1352 (Fed. Cir. 2010) (explaining the Court "generally presume[s] that a special master considered the relevant record evidence even though [the decision] does not explicitly reference such evidence in [the] decision").

explanation in the record for why there was a 22-month gap for seeing a neurologist for GBS treatment?  [PETITIONER:] Yes. . . .  [H]e was basically told there's nothing more that you can do. . . .  [I]t was in his affidavit, about just being residuals of GBS.").  Petitioner, because he did not see his neurologist or seek treatment for GBS symptoms for almost two years, acknowledged the only thing in the record related to balance issues or GBS residuals is petitioner's Affidavit.  *See* Tr. 63:24–64:9 ("THE COURT:  But [petitioner] agree[s], the only thing in the record for the 22-month gap regarding symptoms is [petitioner's] affidavit.  [PETITIONER:] In the record, yes. . . .  Regarding his symptoms in the 22-month gap, there is no treatment . . . records in which he complained of the balance issues during that 22-month period.").  Petitioner also acknowledges there are no therapy records until March 2024 because the symptoms did not "worsen" enough to warrant therapy until this point.  *See* Tr. at 66:23–67:3 ("THE COURT: And the only reason why [petitioner] went in March of 2024 to physical therapy for the first time is because he felt symptoms were worsening?  . . . [PETITIONER:] Correct.").  Petitioner, however, notes he is not relying on the therapy records to supplement the lack of records during the twenty-two-month gap.  *See* Tr. at 67:4–67:16 (THE COURT:  And to confirm, the physical therapy records are in no way related to the 22-month time period. . . .  [PETITIONER:]  That is correct.").  Given the gap in records denoting petitioner's GBS symptoms, the Special Master was required to examine the record and make a factual determination whether petitioner suffered from GBS symptoms for more than six months.  In doing so, the Special Master rationally determined "it is unclear whether Petitioner suffered a new injury or age-related changes during that approximately 22-month gap."  SM Dec. at 9.  As the Special Master "has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision," the Special Master's decision finding petitioner did not suffer from GBS residuals during the twenty-two-month gap was neither arbitrary nor capricious.  *Hines*, 940 F.2d at 1528; *see also Lampe*, 219 F.3d at 1360 ("The arbitrary and capricious standard of review is difficult for an appellant to satisfy with respect to any issue, but particularly with respect to an issue that turns on the weighing of evidence by the trier of fact.").

The Special Master also gave petitioner the opportunity to supplement the record with "objective" evidence petitioner suffered symptoms from GBS for more than six months.  *See* SM Dec. at 2–3 ("I ordered [p]etitioner to file objective evidence that his injury or the residual effects of his injury lasted for at least six months (demonstrating that [p]etitioner continued experiencing symptoms of his alleged GBS in the months between December of 2016 and June of 2017).  Petitioner was given the opportunity to provide this evidence in the form of witness affidavits, medical records, or other evidence.  On April 22, 2024, [p]etitioner filed physical therapy records from March 25, 2024, to support the contention that the residual effects of his injury lasted for at least six months.  Respondent filed a status report, indicating Petitioner's additional medical records did not contain evidence that is helpful to [p]etitioner in satisfying the Vaccine Act's severity requirement.").  When asked, petitioner confirmed the Special Master gave petitioner an opportunity to submit additional evidence supporting his GBS symptoms lasted longer than six months, and petitioner only submitted an affidavit.  *See* Tr. at 25:23–26:8 ("THE COURT:  Now, as part of the proceedings with the Special Master, she did provide the opportunity to admit evidence in the form of witness affidavits, medical records, or other things related to that six month severity requirement, in that [p]etitioner provided a physical therapy record, but the physical therapy record was from March of 2024?  [PETITIONER:]  That is correct. . . .  THE COURT:  And [p]etitioner also provided an affidavit.  [PETITIONER:]  That

is correct."). In making a determination, the Special Master considered both of these additional records to make a finding of fact. *See* SM Dec at 9, 10 n.2 (explaining why the Special Master deemed petitioner's affidavit "insufficient by itself to establish severity" and noting the petitioner's physical therapy records were from 2024). As the Special Master considered both additional submissions, drew plausible inferences, and articulated a rational basis for the decision, the Special Master's determination the affidavit was insufficient to overcome the medical records was not arbitrary or capricious. *See Hines*, 940 F.2d at 1528 (explaining the Special Master is to "consider[] the relevant evidence of record, draw[] plausible inferences and articulate[] a rational basis for the decision"); *see also Lampe*, 219 F.3d at 1360 ("The arbitrary and capricious standard of review is difficult for an appellant to satisfy with respect to any issue, but particularly with respect to an issue that turns on the weighing of evidence by the trier of fact.").

As discussed *supra*, the Special Master thoroughly reviewed the evidence, but ultimately reached a conclusion petitioner did not satisfy the six-month severity requirement to pursue a claim under the Vaccine Act. Petitioner is seeking the Court to reweigh the evidence and make a factual determination different than the Special Master. "[I]t is not . . . the role of this court to reweigh the factual evidence, or to assess whether the special master correctly evaluated the evidence." *Munn*, 970 F.2d at 871. "'[A]rbitrary and capricious' is a highly deferential standard of review. If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines*, 940 F.2d. at 1528; *see also Lampe*, 219 F.3d at 1360 ("The arbitrary and capricious standard of review is difficult for an appellant to satisfy with respect to any issue, but particularly with respect to an issue that turns on the weighing of evidence by the trier of fact."). As such, the Court determines the Special Master's determination petitioner did not satisfy the six-month severity was not arbitrary and capricious. *See Cedillo v. Sec'y of Dept. of Health & Human Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010) (quoting *Lampe*, 219 F.3d at 1363) ("We 'do not sit to reweigh evidence. [If] the Special Master's conclusion [is] based on evidence in the record that [is] not wholly implausible, we are compelled to uphold that finding as not arbitrary or capricious.'") (alterations in original).

## XI.     Whether the Special Master Properly Considered Petitioner's Later Medical Records Supporting GBS Residuals

Petitioner argued the Special Master did not review the record as a whole because the three notations, despite being contemplated in the decision, were not given sufficient weight. Tr. at 18:22–18:25 ("THE COURT: Stated differently, is it that the Special Master did not properly []count certain levels of evidence in accordance with the law? [PETITIONER:] Yes, that is correct."); Tr. at 87:7–87:9 ("THE COURT: [Y]ou agree that the Court cited it and looked at it, just didn't cite the helpful parts or wrestle with it enough. [PETITIONER:] … [L]oosely, yes."). Specifically, petitioner argues the Special Master did not properly "wrestle with the notations" or correctly consider them. *See* Tr. at 87:3–17 ("[PETITIONER:] I don't think that the [Special Master] considered the relevant evidence of the record. . . . [THE COURT:] [Petitioner] agree[s] that the [Special Master] cited [evidence] and looked at it, just didn't cite the helpful parts or wrestle with it enough. . . . [PETITIONER:] [L]oosely, yes. I think there was a lot in those records discussing how far [the symptoms] dated back and the similarities between the

symptoms from GBS . . . .").  To support the Special Master did not properly "wrestle with the evidence" or properly review the record as a whole, petitioner relies on *Kirby v. Secretary of Health and Human Services*, 997 F.3d 1378, 1381 (Fed. Cir. 2021).  *See* Tr. at 85:18–86:20 ("[THE COURT:]  [If the Court] said, 'Well, there's a gap, [and then] there's nothing,' that's fine, but in our instance, the Special Master wrestled with the three medical records in order to determine what was or was not going on and what the causes were. . . .  [PETITIONER:]  I would just disagree that [the Special Master] wrestled [with the evidence], because [the Special Master] . . . disregarded notations of the two-year period . . . .  [THE COURT:]  [B]ut that's different than Kirby.  [PETITIONER:]  Different than Kirby, yes, but . . . there's no argument in Kirby that records were disregarded.").  Petitioner, however, agreed *Kirby* was factually different than this case.  *See* Tr. at 82:6–82:23 ("[PETITIONER:]  [T]here are differences in the facts of this case that were [not] present in Kirby, although the[re] are similarities, but . . . Kirby is really important because the [c]ourt says that there's no presumption and explains . . . why there cannot be a presumption . . . .  A patient may not report every ailment he is experiencing.  A doctor may not accurately record everything he observes.").  Respondent, on the other hand, relies on *Cucuras v. Secretary of Health and Human Services* to demonstrate medical records should be given greater weight than affidavits.  *See* Tr. at 90:12–91:6 ("[RESPONDENT:]  [T]he law does say . . . that contemporaneous medical records that are in conflict with a later testimonial statement, [ ] the contemporaneous medical records should be given greater weight, and . . . the Special Master here clearly considered the record as a whole.").  Petitioner disagreed and argued "every situation is unique and you can't make that blanket statement without looking at the facts of each case to see what's in conflict and when it was created . . . timing is very important as to when the documents were created."  Tr. at 91:3–25.

To the extent petitioner is arguing the Court should review the Special Master's weighing of the evidence, the Court cannot do so.  "[I]t is not . . . the role of this court to reweigh the factual evidence, or to assess whether the special master correctly evaluated the evidence." *Munn v. Sec'y of Dept. of Health & Hum. Servs.*, 970 F.2d 863, 871 (Fed. Cir. 1992).  It is the task of the Special Master—not the Court—to "consider[] the relevant evidence of record, draw[] plausible inferences and articulate[] a rational basis for the decision."  *Hines v. Sec'y of Dep't of Health & Hum. Servs.*, 940 F.2d 1518, 1527–28 (Fed. Cir. 1991).  The Court is to uphold a special master's findings of fact unless they are arbitrary and capricious, but petitioner does not articulate how any of the factual disagreements or the Special Master's weighing of evidence was arbitrary or capricious.  *See Munn*, 970 F.2d at 870 ("The Claims Court owes [fact] findings and conclusions by the special master great deference—no change may be made absent first a determination that the findings were 'arbitrary and capricious.'").  *Kirby* also does not support petitioner's position; rather, it supports the Court does not reweigh factual evidence.  *See* 997 F.3d at 1381 ("'We do not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder.'" (quoting *Porter v. Sec'y of Health and Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011))).  In *Kirby*, the Federal Circuit found the Court of Federal Claims erroneously presumed the medical records were "accurate and complete" and therefore reversed the Special Master.  *Id.* at 1382 ("[The Court of Federal Claims] reasoned that because [petitioner's] medical records from January 2014 through July 2015 are silent about her vaccine injury and indicate she was 'feeling fine,' they undermine her testimony that she continued to experience symptoms during this

period." (citation omitted)).  The Federal Circuit "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions" and found the Special Master's decision that petitioner's injury lasted longer than six months was not arbitrary and capricious because such findings were "based . . . on plausible evidence, i.e., [petitioner's] lay testimony, corroborating documentation, and expert testimony." *Id.* at 1381, 1383.  The Federal Circuit therefore found it was improper for the Court of Federal Claims to reverse the Special Master's factual determination petitioner satisfied the six-month severity requirement.  *Id.* at 1385.  In other words, the Federal Circuit upheld the Special Master's decision because it was neither arbitrary nor capricious for the Special Master—after reviewing the record as a whole—to determine petitioner's vaccine injury lasted longer than six months. *Id.*  Here, the Special Master reviewed the record as a whole and made a factual determination petitioner did not satisfy the six-month severity requirement.  *See supra* Sections IX, X.  The Court will therefore not reweigh the evidence—such a task is reserved for the Special Master as a fact finder.  *Munn*, 970 F.2d at 871.

Additionally, *Kirby* is distinguishable from this case.  In *Kirby*, the medical records were silent as to "the existence or nonexistence" of petitioner's vaccine injury.  997 F.3d 1380 ("The records of these visits are silent about the existence or nonexistence of any arm pain, muscle weakness, or numbness.").  Here, the medical records were not silent on GBS; rather, there were multiple records noting petitioner was not suffering from GBS residuals.  *See supra* Sections IX, X (describing multiple records noting petitioner was not suffering from GBS and had recovered). At oral argument, petitioner agreed *Kirby* was distinguishable from this case because the medical records were not silent as to petitioner's GBS symptoms.  *See* Tr. at 85:18–86:4 ("THE COURT: So if we just said, 'Well there's a gap, there's nothing, that's fine, but in our instance, the Special Master wrestled with the three medical records in order to determine what was or was not going on and what the causes were. . . .  that's different than Kirby.  [PETITIONER:]  Different than Kirby, yes.").  As discussed *supra*, the Special master considered *all* the medical records in making a determination petitioner did not suffer from GBS residuals for longer than six months. *See supra* Section IX (finding the Special Master reviewed the record as a whole); *supra* Section X (finding the Special Master properly weighed the evidence in reaching a determination on the six-month severity requirement).  Accordingly, as the Special Master "considered the relevant evidence of record, [drew] plausible inferences and articulated a rational basis for the decision," the determination petitioner did not satisfy the six-month severity requirement was neither arbitrary nor capricious.  *See Hines*, 940 F.2d at 1528.

## XII.    Conclusion

For the foregoing reasons, the Court **SUSTAINS** the Special Master's decision finding petitioner did not meet the six-month severity requirement because it was not arbitrary, capricious, or not otherwise in accordance with law.  Accordingly, the Court **DENIES** petitioner's Motion for Review of the Special Master's Decision, ECF No. 79.  The Clerk's Office is directed to enter judgment for respondent in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

s/ Ryan T. Holte

RYAN T. HOLTE
Judge